No. 14-50046

---

# In the United States Court of Appeals for the Fifth Circuit

---

*IN THE MATTER OF:  AGE REFINING, INCORPORATED, DEBTOR*

-----------------------------------------

*THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, APPELLANT*

*v.*

*ERIC J. MOELLER, CHAPTER 11 TRUSTEE FOR AGE REFINING, INCORPORATED*

_____

*IN THE MATTER OF:  AGE REFINING, INCORPORATED, DEBTOR*

-----------------------------------------

*THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, APPELLANT*

*v.*

*CHASE CAPITAL CORPORATION; LIQUIDATING TRUSTEE RANDOLPH N. OSHEROW, APPELLEES*

_____

*IN THE MATTER OF:  AGE REFINING, INCORPORATED, DEBTOR*

-----------------------------------------

*THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, APPELLANT*

*v.*

*RANDOLPH N. OSHEROW, CHAPTER 11 TRUSTEE, APPELLEE*

---

FROM THE UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION
CIVIL ACTION NO. SA-12-CA-64 (CONSOLIDATED WITH SA-12-CA-41 AND SA-12-CA-289)
HONORABLE HARRY LEE HUDSPETH, PRESIDING

## JOINT BRIEF OF CHASE CAPITAL CORPORATION AND RANDOLPH N. OSHEROW, APPELLEES

**FULBRIGHT & JAWORSKI LLP**
Toby L. Gerber
Texas Bar No. 07813700
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone:  214-855-8000
Telecopier:  214-855-8200

Steve A. Peirce
Texas Bar No. 15731200
300 Convent Street, Suite 2100
San Antonio, TX  78205-3792
Telephone:  210-224-5575
Telecopier:  210-270-7205

*Counsel for Appellee Chase Capital Corporation*

LANGLEY & BANACK, INC.
David S. Gragg
Texas Bar No. 08253300
Natalie F. Wilson
Texas Bar No. 24076779
745 East Mulberry, Suite 900
San Antonio, Texas  78212
Telephone:  210-736-6600
Telecopier:  210-735-6889

*Counsel for Appellee Randolph N. Osherow in his capacity as successor-in-interest to Eric J. Moeller, Chapter 11 Trustee of the Estate of AGE Refining, Inc.*

Chase Capital Corporation ("**Chase**") and Randolph N. Osherow, in his capacity as the successor-in-interest to Eric J. Moeller, Chapter 11 Trustee ("**Osherow**" and together with Chase, "**Appellees**") file this Joint Appellees' Brief in response to the brief of Appellant Official Committee of Unsecured Creditors (the "**Committee**") and show the Court as follows:

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5TH CIR. R. 28.2.1, the undersigned counsel of record certify that the following listed persons and entities have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

The Official Committee of Unsecured Creditors, Appellant.

Chase Capital Corporation, Appellee.

Randolph N. Osherow, in his capacity as successor-in-interest to Eric J. Moeller, Chapter 11 Trustee for the estate of AGE Refining, Inc., Appellee.

David S. Gragg, Steven R. Brook, Natalie F. Wilson, Langley & Banack, Inc., 745 E. Mulberry, Suite 900, San Antonio, Texas 78212-3166, counsel for Appellee Randolph N. Osherow in his capacity as successor-in-interest to Eric J. Moeller, Chapter 11 Trustee for the estate of AGE Refining, Inc.

Toby L. Gerber, Fulbright & Jaworski LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, counsel for Appellee Chase Capital Corporation.

Steve A. Peirce, Fulbright & Jaworski LLP, 300 Convent Street, Suite 2100, San Antonio, Texas 78205-3792, counsel for Appellee Chase Capital Corporation.

Michael G. Colvard, Martin & Drought, P.C., 300 Convent Street, 25th Floor, San Antonio, Texas 78205, counsel for Appellant Official Committee of Unsecured Creditors.

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| Bankr. Claim Register | Claims Register in USBC Case No. 10-50501. |
| Bankr. 0000 | Document at docket number in USBC Case No. 10-50501, with page number indicated in parenthesis. |
| Committee 5th Brief | Appellant's Brief filed with this Court. |
| Committee District Brief | Appellant's Brief filed by the Committee with the District Court USDC Case No. SA-12-CA-64 Dkt. 28. |
| Dist. 0000 | Document at docket number in USDC Case No. SA-12-CA-64, with page number indicated in parenthesis. |
| ROA.0000 | Page of electronic record. |
| Tr. Ex. CC00 or Tr. Ex. CTE00 | Exhibit in evidence at October 27, 2011 hearings before the bankruptcy court.  "CC" means a Chase exhibit, while "CTE" means a Committee exhibit. |

## STATEMENT REGARDING ORAL ARGUMENT

Appellees Chase and Osherow contend that oral argument would not be beneficial.  There are no novel or difficult legal issues involved in the case.  The main issues are whether the bankruptcy court's factual findings are clearly erroneous, whether the bankruptcy court abused its discretion in approving a

settlement, and whether the bankruptcy court erred in finding that Chase was impaired under the chapter 11 plan.

# Table of Contents

Page

CERTIFICATE OF INTERESTED PERSONS .................................................... iii

TABLE OF ABBREVIATIONS ............................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ........................................... iv

TABLE OF AUTHORITIES ..................................................................ix

I.      COUNTER-STATEMENT OF THE ISSUES ................................... 1

II.     STATEMENT OF THE CASE ........................................................ 1

        A.     Introduction ............................................................... 1

        B.     The Debtor, its Refinery, the Tank Farm, the Adjacent
               Real Property, and the Redfish Terminal.................................. 4

        C.     The Bankruptcy ......................................................... 5

        D.     Chase and JPMorgan's Pre-petition Claims ............................. 5

        E.     The Financing Order ..................................................... 6

        F.     The Committee ........................................................... 7

        G.     May 2010 Fire and Resulting Insurance Claims ....................... 7

        H.     Chapter 11 Trustee ...................................................... 8

        I.     Gonzalez Litigation ..................................................... 8

        J.     Refinery Sale to NuStar ................................................. 8

        K.     Refinery Sale Still Needed True-Up of Working Capital ........ 10

        L.     What NuStar Did Not Purchase ....................................... 10

        M.     Redfish Terminal Sale .................................................. 10

        N.     JPMorgan Paid From the Net Proceeds of the Redfish
               Bay Sale ................................................................ 11

        O.     Working Capital True-Up .............................................. 13

        P.     The Payment Order ..................................................... 14

        Q.     Chase's Motion to Compel Payment of Post-petition
               Interest ................................................................... 14

        R.     The Committee's Application to Value Chase's
               Collateral and Claim Objection ...................................... 15

# Table of Contents
(continued)

Page

S.     The Chase Settlement.................................................16

T.     Hearings Held ......................................................17

U.     November 1, 2011 Chase Settlement Ruling...........................20

V.     Chase Settlement Order Entered and Other Matters
       Denied .........................................................21

W.     The Chase Settlement Appeal.......................................21

X.     The Chapter 11 Plan...............................................22

Y.     District Court Appeal on the Merits ..............................25

III.   SUMMARY OF THE ARGUMENT.............................................25

IV.    ARGUMENT ...........................................................28

V.     ISSUE 1: WHETHER THE BANKRUPTCY COURT
       ABUSED ITS DISCRETION IN APPROVING THE CHASE
       SETTLEMENT .........................................................28

       A.     Chase Claimed it Was Oversecured and Entitled to Post-
              petition Interest .........................................28

       B.     Approval Of A Settlement Is Based On The Trustee's
              Business Judgment And The Court's Discretion...............29

       C.     No Evidentiary Or Mini Trial Required; Canvass The
              Issues To See If The Settlement Falls Below The Lowest
              Point Of Reasonableness....................................30

       D.     Best Interest Of the Estate Standards......................31

VI.    ISSUE 2: WHETHER THE BANKRUPTCY COURT ERRED
       IN DENYING THE APPLICATION TO VALUE AND THE
       CLAIM OBJECTION AFTER CONSIDERING THE SAME
       ISSUES IN APPROVING THE CHASE SETTLEMENT ...............35

VII.   ISSUE 3: WHETHER THE BANKRUPTCY COURT ERRED
       IN CONFIRMING THE PLAN ............................................36

VIII.  ISSUE 4: WHETHER THE COMMITTEE'S NINE
       ARGUMENTS HAVE ANY MERIT...........................................41

       A.     Waiver Issues .............................................41

# Table of Contents
(continued)

Page

B.    This Appeal is Primarily a Clear Error Challenge...................42

C.    Committee Argument No. 1:.......................................................43

D.    Committee Argument No. 2.......................................................45

E.    Committee Argument No. 3.......................................................46

F.    Committee Argument No. 4.......................................................53

G.    Committee Argument No. 5.......................................................54

H.    Committee Argument No. 6.......................................................55

I.    Committee Argument No. 7........................................................56

J.    Committee Argument No. 8........................................................56

K.    Committee Argument No. 9.......................................................57

IX.    CONCLUSION ..............................................................................57

CERTIFICATE OF SERVICE .............................................................59

CERTIFICATE OF COMPLIANCE ....................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Airadigm Communs., Inc. v. FCC (In re Airadigm Communs., Inc.)*,
    547 F.3d 763 (7th Cir. 2008) ............................................................37

*Albrechtsen v. Board of Regents*,
    309 F.3d 433 (7th Cir. 2002) ............................................................41

*Cajun Elec.,* 119 F.3d at 356.................................................30, 31, 32

*In re Capmark Fin. Group Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010).....................................29, 30, 31

*Cavallini v. State Farm Mut. Auto Ins. Co.*,
    44 F.3d 256 (5th Cir. 1995) ..............................................................41

*CFB-5, Inc. v. Cunningham*,
    371 B.R. 175 (N.D. Tex. 2007) ...................................................30, 31

*Cinel v. Connick*,
    15 F.3d 1338 (5th Cir. 1994) ............................................................41

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.(In re Foster
    Mortgage Corp.)*,
    68 F.3d 914 (5th Cir. 1995) ...............................................20, 29, 32

*Depoister v. Mary M. Holloway Found.*,
    36 F.3d 582 (7th Cir. Ill. 1994)........................................................30

*Doe v. Veneman*,
    380 F.3d 807 (5th Cir. 2004) ......................................................35, 44

*E. 44th Realty, LLC v. Kittay*,
    2008 U.S. Dist. LEXIS 7337 (S.D.N.Y. Jan. 23, 2008) ..............30, 31

*In re Global Vision Prods., Inc.*,
    2009 U.S. Dist. LEXIS 64213 (S.D.N.Y. 2009)................................29

*Guippone,* 2011 U.S. Dist. LEXIS at 126026 *14-15 ...........................30

*In re Heritage Organization, L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007)................................................35

*In re Placid Oil Co.*, 158 Bankr. 404, 412 (N.D. Tex. 1993)...................54

*In re Introgen Therapeutics*,
  429 B.R. 570 (Bankr. W.D. Tex. 2010)..............................................40

*In re Kaiser Aluminum Corp.*,
  339 B.R. 91 (D. Del. 2006).........................................20, 34, 36, 44, 55

*Key Bank N.A. v. Milham (In re Milham)*,
  141 F.3d 420 (2d Cir. 1998) .............................................................37

*Kohler v. Englade*,
  470 F.3d 1104 (5th Cir. 2006) .....................................................41, 45

*In re Lee Way Holding Co.*,
  120 B.R. 881 (Bankr. S.D. Ohio 1990) ........................................30, 32

*Preiser v. Newkirk*,
  422 U.S. 395 (1975).........................................................................36

*R.I. Dep't of Envtl. Mgmt. v. United States*,
  304 F.3d 31 (1st Cir. 2002)...............................................................41

*Reich v. Lancaster*,
  55 F.3d 1034 (5th Cir. 1995) .......................................................42, 43

*Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*,
  160 F.3d 1054 (5th Cir. 1998) ...........................................................29

*Stern v. Halligan*,
  158 F.3d 729 (3d Cir. 1998) ..............................................................41

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) .............................................................38

*United States v. Thames*,
  214 F.3d 608 (5th Cir. 2000) .............................. 41, 44, 45, 46, 55, 56

*In re Vill. at Camp Bowie I, L.P.*,
  454 B.R. 702 (Bankr. N.D. Tex. 2011).............................................38

*In re W.T. Grant Co.,*
    699 F.2d 599 (2d Cir. 1983) ...............................................................31

*Wright v. Union Central Life Ins. Co.,*
    311 U.S. 273 (1940)............................................................................6

*Yunker v. Allianceone Receivables Mgmt.,*
    701 F.3d 369 (11th Cir. 2012) ....................................................35, 44

## RULES AND STATUTES

11 U.S.C. § 361 ..............................................................................6, 25

11 U.S.C. § 363 ....................................................................................25

11 U.S.C. § 363(a) .................................................................................6

11 U.S.C. § 363(e) .................................................................................6

11 U.S.C. § 364 ......................................................................................6

11 U.S.C. § 364(d)(1)(B) ......................................................................6

11 U.S.C. § 502 ..............................................................................35, 38

11 U.S.C. § 506(b) ............................................... 14, 25, 28, 29, 32, 37, 38

11 U.S.C. § 506(c) .................................................................................7

11 U.S.C. § 1124..............................................................................4, 43

11 U.S.C. § 1124(1) .......................................................................38, 39

11 U.S.C. § 1126(a) .............................................................................38

11 U.S.C. § 1129 ..................................................................................24

11 U.S.C. § 1129(a)(1)...................................................................45, 46

11 U.S.C. § 1129(a)(7)......................................................24, 45, 46, 56

11 U.S.C. § 1129(a)(10).......................................................................37

11 U.S.C. § 1129(b)(2)(A)...................................................................17

28 U.S.C. § 158(a) ....................................................................................54

5TH CIR. R. 25.2.1, I .................................................................................59

5TH CIR. R. 25.2.13, I ...............................................................................59

5TH CIR. R. 28.2.1 ......................................................................................iii

5TH CIR. R. 31 ..........................................................................................59

FED. R. APP. P. 25(a)(2)(B) ......................................................................59

FED. R. APP. P. 31 ...................................................................................59

FED. R. APP. P. 32(a)(5) ..........................................................................60

FED. R. APP. P. 32(a)(6) ..........................................................................60

FED. R. APP. P. 32(a)(7)(B) ......................................................................60

FED. R. APP. P. 32(a)(7)(B)(iii) .................................................................60

FED. R. BANKR. P. 9019............................................................................43

FED. R. BANKR. P. 9019(a) .......................................................................29

FED. R. BANKR. P. 3020(b)(2) ..................................................................39

FED. R. BANKR. P. 9019(a) .......................................................................29

## OTHER AUTHORITIES

Jacquelyn Michael Davis, *Marshaling of Assets in Bankruptcy*, 5
    BANK. DEV. J. 309 (1987) ...............................................................7, 49

Moore's Federal Practice - Civil, § 206.03[2] (3d ed. 2013) ...................42

United States Constitution, Art. III ........................................................35

# I.
## COUNTER-STATEMENT OF THE ISSUES

This appeal involves whether the bankruptcy court erred in (a) approving a settlement and (b) in confirming a chapter 11 plan.

**ISSUE: 1 WHETHER THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN APPROVING THE CHASE SETTLEMENT**

**ISSUE 2: WHETHER THE BANKRUPTCY COURT ERRED IN DENYING THE APPLICATION TO VALUE AND THE CLAIM OBJECTION AFTER CONSIDERING THE SAME ISSUES IN APPROVING THE CHASE SETTLEMENT**

**ISSUE 3: WHETHER THE BANKRUPTCY COURT ERRED IN CONFIRMING THE PLAN**

**ISSUE 4:    WHETHER THE COMMITTEE'S NINE ARGUMENTS HAVE ANY MERIT**

# II.
## STATEMENT OF THE CASE

**A.    Introduction**

1.    This appeal arises from the chapter 11 bankruptcy case of AGE Refining, Inc., ("**AGE**" or "**Debtor**"), which was filed on February 8, 2010.  On March 17, 2010, the **Committee**[1] was appointed.[2]  On July 6, 2010, the **Trustee**[3] was appointed to manage AGE.  During the bankruptcy, AGE's main assets were

---

[1] "**Committee**" means Official Committee of Unsecured Creditors (Appellant).
[2] Bankr. 138.
[3] The "**Trustee**" is Eric J. Moeller, Chapter 11 Trustee for the AGE estate (the "**Trustee**"). ROA.1074:4-7.

liquidated.  On August 2, 1011, **Chase**[4] filed its **Motion to Compel**,[5] contending that it was oversecured based on the value of its collateral and therefore entitled to approximately $6.4 million in post-petition interest.  The Committee objected to the Motion to Compel, and filed its own **Application to Value**[6] Chase's collateral.  Chase also filed two administrative claims: the **Post-petition Interest Administrative Claim**[7] and the **Diminution Claim.**[8]  The Committee objected to these claims in its **Claim Objection.**[9]  The Trustee also filed a limited joinder in the Committee's Claim Objection.[10] The Trustee and Chase entered into the **Chase Settlement**[11] which compromised and settled all objections to Chase's Motion to Compel and Chase's two administrative claims.  The Chase Settlement allowed Chase a secured claim of approximately $3.6 million and an unsecured claim of approximately $1.4 million and provided for the means to pay administrative

---

[4] "**Chase**" means Chase Capital Corporation (an Appellee).

[5] "**Motion to Compel**" means August 2, 2011 "Motion Of Chase Capital Corporation To Compel Payment Of Principal, Interest And Other Charges Pursuant To 11 U.S.C. § 506(b)" at Bankr. 1100.

[6] "**Application to Value**" means August 23, 2011 "Official Committee Of Unsecured Creditors' Amended Application To Value The Secured Claim Of Chase Capital Corporation Under Bankruptcy Code § 506(A) And (B)" at Bankr. 1156.

[7] "**Post-petition Interest Administrative Claim**" means August 1, 2011 Administrative Expense Claim Of Chase Capital Corporation at Bankr. Claim Register 161-1 and Tr. Ex. CC91.

[8] "**Diminution Claim**" means August 1, 2011 Administrative Expense Claim Of Chase Capital Corporation found at ROA.1054, Bankr. Claim Register 162-1, and Tr. Ex. CC45.

[9] "**Claim Objection**" means August 18, 2011 "Objection By The Official Committee Of Unsecured Creditors To Administrative Claims Of Chase Capital Corporation, Claim Number 161-1 And Claim Number 162-1" at Bankr. 1132.

[10] See Limited Joinder at Bankr. 1148.

[11] "**Chase Settlement**" means the agreement attached as Exhibit A to the Chase Settlement Motion at Bankr. 1251 Exhibit A and Tr. Ex. CC47.  Portions of the Chase Settlement are also at ROA.1064 *et. seq.*

expenses and confirm a chapter 11 plan.[12]   The Committee objected to the settlement.[13]   The bankruptcy court held a day-long **Chase Settlement Hearing**[14] and then issued the **Chase Settlement Ruling**[15] and entered the November 2, 2011 **Chase Settlement Order**[16] approving the Chase Settlement.

2.     In the meantime, the Trustee proposed a chapter 11 plan.[17]   The plan incorporated the terms of the previously-approved and unstayed Chase Settlement.[18]   The Committee objected to plan confirmation.[19]   On December 8, 2011, creditor ballots were filed.[20]   On December 9, 2011, the Trustee made redlined changes to the plan.[21]   Among those changes were the recognition that a $200,000 payment due to Chase under the Chase Settlement had not been made (in order to correct an error in the plan) and that such payment would not be made until after plan confirmation.[22]   The **Plan Confirmation Hearing**[23] was held on

---

[12] ROA.1064, et seq. Bankr. 1251 Ex. A and Tr. Ex. CC47.
[13] Bankr. 1292.
[14] "**Chase Settlement Hearing**" means the bankruptcy court hearing held on October 27, 2011. See transcript at Bankr. 1426 (1-455).  Key excerpts are at ROA.1068 *et. seq.*
[15] "**Chase Settlement Ruling**" means the November 1, 2011 ruling on the Chase Settlement Motion, the Motion to Compel, Post-petition Interest Administrative Claim, Diminution Claim, Application to Value, and the Claim Objection.   Key excerpts are at ROA.1143 through ROA.1150.  Full transcript at Bankr. 1367.
[16] "**Chase Settlement Order**" means November 2, 2011 "Order Approving Compromise" at ROA.915 and Bankr. 1362.
[17] On November 15, 2011, the Trustee filed his Third Amended Plan.  Bankr. 1395.
[18] Bankr. 1395 (22 of 48).
[19] Bankr. 1442.
[20] Bankr. 1448.
[21] Bankr. 1450.
[22] Bankr. 1450 (24 of 52).  Transcript at Bankr. 1526 (32 of 67).
[23] Bankr. 1526.

December 9, 2011. The bankruptcy court entered a **Confirmation Order**[24] confirming the "**Plan**."[25] The Plan created a Liquidating Trust administered by Randolph N. Osherow as Liquidating Trustee.[26]

3.     The Committee challenges the facts, contending that Chase's collateral value was lower than the amount of Chase's claim, so the Chase Settlement should not have been approved. The Committee also contends that Chase was not an "impaired" creditor under 11 U.S.C. § 1124, so Chase's vote on the Plan should not have counted and therefore the Plan should not have been confirmed. The District Court affirmed the bankruptcy court.[27]

## B.     The Debtor, its Refinery, the Tank Farm, the Adjacent Real Property, and the Redfish Terminal

4.     Prior to the sale of its assets in bankruptcy, AGE (a) owned a refinery ("**Refinery**");[28] (b) owned a tank farm (the "**Tank Farm**");[29] (c) owned land near the refinery ("**Adjacent Real Property**");[30] and (4) subleased a terminal in Redfish Bay, Texas (the "**Redfish Terminal**").[31]

---

[24] "**Confirmation Order**" means December 15, 2011 "Findings of Fact, Conclusions of Law and Order Confirming Chapter 11 Plan" at Bankr. 1460 and ROA.806 through ROA.838.

[25] The "**Plan**" means the Fourth Amended Chapter 11 Plan of Reorganization for AGE Refining, Inc. at ROA.326 through ROA.376 and Bankr. 1459.

[26] Plan at ROA.326 and Bankr. 1459. ROA.1662. Bankr. 1513.

[27] Memorandum Opinion at ROA.2174 and Dist. 33 and Judgment at ROA.1219 and Dist. 34.

[28] The Refinery is described at Tr. Ex. CC17 at Ex. A, p. 50.

[29] The Tank Farm is described in Tr. Ex. CC94.

[30] The Adjacent Real Property is described at Tr. Ex. CC17.

[31] The Redfish Terminal is described in Tr. Ex. CC20 (n. 1).

## C.    <u>The Bankruptcy</u>

5.    On February 8, 2010 (the "**Petition Date**"), AGE filed a voluntary chapter 11 bankruptcy.[32]

## D.    <u>Chase and JPMorgan's Pre-petition Claims</u>

6.    Chase held a $40.2 million claim against AGE (the "**Chase Pre-petition Claim**").[33]

7.    JPMorgan Chase Bank, N.A. ("**JPMorgan**")[34] held a $34.7 million claim against AGE (the "**JPMorgan Pre-petition Claim**").[35]

8.    Chase held a first lien on in virtually all of AGE's property, *including* the Refinery, but *excluding* the Tank Farm, the Adjacent Real Property, and the Redfish Terminal.[36]

9.    Chase held a second lien on AGE's cash, inventory and accounts (the "**Working Capital**")[37] and JPMorgan held the first lien on the Working Capital.[38]

---

[32] Bankr. 1.

[33] ROA.1059.  Bankr. 1109 and Tr. Ex. CC61 (2 of 5).  The Chase Proof of Claim is at Tr. Ex. CC1.  The Chase loan documents are at Tr. Ex. CC62-89.

[34] In the lower court record, JPMorgan is sometimes referred to as "**Chase Bank**."

[35] ROA.1059.  Payment Order at Bankr. 1109 and Tr. Ex. CC61 (2 of 5).  The JPMorgan Proof of Claim is at Tr. Ex. CC44, and the JPMorgan loan documents are described therein.  Financing Order at Bankr. 113 and Tr. Ex. CC4 (¶10).

[36] ROA.1140:4-15.  ROA.1141:2-11.  Bankr. 1426 (215, 238 of 455).  Tr. Ex. CC62-89.

[37] Based upon an analysis as of the Petition Date, Chase's second lien on the Working Capital was worth approximately $14.730 million.  ROA.1054.  ROA.1057.  Bankr. Claim Register 162-1.  Tr. Ex. CC45.  The Working Capital is described at ROA.1055 and ROA.1078 through ROA.1080, ROA.1125 through ROA.1126, and Bankr. 1426 (66-68 and 185-186 of 455).

[38] ROA.1140:4-15.  ROA.1142:16-17.  Bankr. 1426 (215, 241 of 455).

10.     Age Transportation, Inc. ("**ATI**"), a company affiliated with AGE's former principal, Glen Gonzalez, owed AGE approximately $1.7 million ("**ATI Receivable**").[39] Chase held a lien on the ATI Receivable.[40]

### E.     The Financing Order

11.     AGE requested bankruptcy court approval for the use of the cash collateral of JPMorgan and Chase under 11 U.S.C. § 363(a) and also for approval of a revolving post-petition financing facility with JPMorgan pursuant to 11 U.S.C. § 364.[41]   On March, 3, 2010, the bankruptcy court entered the **Financing Order**.[42] The Financing Order (a) provided authority for AGE (and later, the Trustee) to obtain post-petition loans[43] from JPMorgan,[44] (b) provided for the use of the cash collateral of JPMorgan and Chase, subject to certain conditions, including the provision of adequate protection[45] by the estate to JPMorgan and Chase,[46] (c) granted liens to JPMorgan on all assets of the bankruptcy estate, including first

---

[39] ROA.1093:2-25.  ROA.1094:1-25.  ROA.1095:1-25.  ROA.1096:1-13.  Bankr. 1426 (81-84 of 455).

[40] ROA.1136:11-21.  Bankr. 1426 (211 of 455).

[41] Bankr. 13.  Tr. Ex. CC5.

[42] "Amended Final Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured By Senior Liens, And Granting Adequate Protection To Existing Lienholders" (the "**Financing Order**").  Bankr. 113 and Tr. Ex. CC4.

[43] This financing is called "Debtor-in-Possession" or "DIP" Financing.  After the Trustee's appointment, it was sometimes referred to as "**TIP" Financing**."

[44] The Financing Order is at Bankr. 113 and at Tr. Ex. CC4.

[45] "Adequate protection" is a term of art in bankruptcy.   11 U.S.C. § 361, 363(e), and 364(d)(1)(B).  *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940).

[46] Bankr. 113 and Tr. Ex. CC4.

liens on unencumbered assets[47] and (d) provided that AGE stipulated to the allowance of the JPMorgan Pre-petition Claim and the Chase Pre-petition Claim and to the validity and priority of the liens securing those claims.[48]

12.     Additionally, under the Financing Order, no Bankruptcy Code section 506(c) surcharges would be permitted without the consent of JPMorgan and Chase, and no marshaling[49] would be required with respect to application of their collateral to their claims.[50]

## F.     **The Committee**

13.     On March 17, 2010, the Committee was appointed.[51]

## G.     **May 2010 Fire and Resulting Insurance Claims**

14.     In May 2010, a fire occurred at the refinery, causing an interruption in operations.[52]   The fire resulted in insurance claims being made by AGE (the

---

[47] Bankr. 113 and Tr. Ex. CC4 (13 of 45 ¶33).  ROA.1131:17-21 ("Chase Bank [JPMorgan], under the DIP Facility, had a lien on all of the assets of the estate.").  Bankr. 1426 (108 of 455)("I understood that Chase Bank had, essentially, a lien on everything, to ensure that they got paid their TIP balance.")

[48] Bankr. 113 and Tr. Ex. CC4 (6 of 45 ¶11 and 7-9 of 45).

[49] Marshaling of assets is an equitable doctrine, typically used to force a secured creditor to satisfy its claim from one source of collateral as opposed to another.  *See generally* Jacquelyn Michael Davis, *Marshaling of Assets in Bankruptcy*, 5 BANK. DEV. J. 309 (1987).

[50] ROA.1051(¶71).  Bankr. 113 and Tr. Ex. CC4 (28 of 45, ¶ 71).

[51] Bankr. 138.

[52] ROA.1075:12-25.  ROA.1098:10-21.  Bankr. 1426 (63 and 86 of 455).  Moeller Affidavit at Bankr. 909 and Tr. Ex. CC15 (¶3).  Schmidt Affidavit at Bankr. 911 and Tr. Ex. CC16 (¶5).

"**Insurance Claims**").  Chase held liens on the proceeds of the Insurance Claims.[53]
The Insurance Claims were for $5.2 million.[54]

## H.     Chapter 11 Trustee

15.     Effective July 8, 2010, Mr. Moeller was appointed Chapter 11 Trustee
for the AGE estate (the "**Trustee**").[55]

## I.     Gonzalez Litigation

16.     During the bankruptcy, the Trustee brought claims on behalf of the
estate against AGE's former principal and some of his family members in Adv.
No. 10-05120 ("**Gonzalez Litigation**").[56]  Chase had no lien on the proceeds from
the Gonzalez Litigation claims.[57]

## J.     Refinery Sale to NuStar

17.     On April 1, 2011, the Trustee filed a motion to approve the sale of the
Refinery, the Working Capital, the Adjacent Real Property, and the Tank Farm
(collectively, the "**Refinery Assets**") to NuStar Energy, L.P. ("**NuStar**").[58]

18.     The bankruptcy court approved the sale of the Refinery Assets to
NuStar sale via the April 14, 2011 **Refinery Sale Order**.[59]  The sale was for a

---

[53] ROA.1098:10-21. ROA.1099:1-11.  ROA.1104:21-25.  ROA.1105:1-3.  Bankr. 1426 (86-87, 92-93 of 455).
[54] ROA.1098:10-25.  ROA.1099:1-11.  Bankr. 1426 (86-87).
[55] ROA.1074:4-7.  Bankr. 1426 (62 of 455).  Bankr. 410.  Bankr. 413.
[56]  ROA.1096:14-24.   Bankr. 1426 (84 of 455).   Moeller Affidavit at Bankr. 909 and Tr. Ex. CC15 (6 n.4).
[57] ROA.1110:20-24.  Bankr. 1426 (98 of 455).
[58] Bankr. 879.  Tr. Ex. CC12. Bankr. 901.  Tr. Ex. CC13.  Bankr. 903.  Tr. Ex. CC14.

Base Purchase Price of $41 million, plus the Net Working Capital Adjustment,[60] plus the Platinum Price.[61]   The Refinery Sale Order provides at ¶19:

> The Trustee is hereby authorized and directed to make the following interim, partial cash distributions of proceeds of the Sale to JPMorgan Chase Bank, N.A. and Chase Capital Corporation at Closing (collectively, the "**Chase Payments**"): A. to JPMorgan Chase Bank, N.A., an amount equal to the sum of the Net Working Capital Adjustment and the Platinum Proceeds minus $3 million.   B. To Chase Capital Corporation, $36 million dollars.[62]

Bankr. 913.  Tr. Ex. CC17.

19.     The Refinery Sale Order also provides at ¶27 that after payment of expenses and the Chase Payments, the balance of the proceeds of the sale shall be retained by the Trustee subject to the liens and interests of Chase Bank [JPMorgan]

---

[59] Order Authorizing and Approving the Sale of Certain of the Debtors Assets Free and Clear of All Liens, Claims and Encumbrances Outside the Ordinary Course of Business and to Assume and Assign Certain Executory Contracts and Unexpired Leases and Approving Interim Distribution of Certain Sale Proceeds ("**Refinery Sale Order**").  Bankr. 913 and at Tr. Ex. CC17.

[60] A final adjustment and true-up of Working Capital was to be made post-closing.  At the time of the closing, such adjustment and true-up had not been made and it was uncertain whether any additional funds were due and payable to the bankruptcy estate as a result of the sale of the Refinery Assets or whether the Trustee would have to return some of the sale proceeds to NuStar.  Notice of Finalization of Working Capital at Bankr. 1019 and Tr. Ex. CC22.

[61] See ROA.1077:15-25.  Bankr. 1426 (65 of 455).  Moeller Affidavit at Bankr. 909 and Tr. Ex. CC15.  Schmidt Affidavit at Bankr. 911 and Tr. Ex. CC16.  Refinery Sale Order at Bankr. 913 and at Tr. Ex. CC17.

[62] This payment reduced Chase's prepetition claim to approximately $4.212 million in principal plus any allowable post-petition interest and fees, secured by, among other estate assets, the remaining proceeds of the sale of the Refinery Assets and the second lien on Working Capital, including any proceeds from the adjustment and true-up of the Working Capital.  Bankr. 1019 and Tr. Ex. CC22.

and Chase and other parties holding interests pending further order of the bankruptcy court.[63]

## K.  Refinery Sale Still Needed True-Up of Working Capital

20.    On April 19, 2011, the Trustee filed a Notice of Closing of Sale of the Refinery Assets, providing notice that the sale to NuStar had closed.[64]  However, that closing was still subject to the escrow of certain funds ($8,118,563) for adjustment, true-up, and additional payment (either by or to NuStar, as required) once a final Working Capital Adjustment was determined by Trustee and NuStar.[65] This is known as the **Working Capital True-Up**.

## L.  What NuStar Did Not Purchase

21.    NuStar did not purchase the Redfish Terminal (which was subject to JPMorgan's post-petition lien), nor did it purchase the Insurance Claims or the Gonzalez Litigation.[66]

## M.  Redfish Terminal Sale

22.    On May 19, 2011, the Trustee filed a motion to approve the sale of the Redfish Terminal to TexStar MidStream Services, LP ("**TexStar**").[67]   The bankruptcy court approved the sale of the Redfish Terminal to TexStar via a May

---

[63] Bankr. 913 and at Tr. Ex. CC17 (¶27).
[64] Bankr. 921 and Tr. Ex. CC18.
[65] Bankr. 921 and Tr. Ex. CC18.  Notice of Finalization of Working Capital at Bankr. 1019 and Tr. Ex. CC22.
[66] Schmidt Affidavit at Bankr. 911 and Tr. Ex. CC16 (¶9).  Bankr. 913.  Tr. Ex. CC17.
[67]  Bankr. 974.  Bankr. 978 and Tr. Ex. CC20.

20, 2011 Redfish Sale Order.[68]    The sales price was $6,500,000 ("**Redfish Proceeds**").[69]

## N.    JPMorgan Paid From the Net Proceeds of the Redfish Bay Sale

23.    Recall that JPMorgan held a lien on the Redfish Proceeds under the Financing Order.    The May 20, 2011 Redfish Sale Order provided that, immediately upon closing, the Trustee was required to pay the Redfish Proceeds to JPMorgan for application to the remaining Tranche B balance of the JPMorgan Credit Facility [70] plus interest and other fees.[71]    The Redfish Sale Order states:

> The proceeds from the sale of the Redfish Bay Assets shall be used to
> (i) pay [closing costs, fees, ordinary course expenses and payables]
> and, immediately upon closing, shall be used for the payment of the
> so-called Tranche B portion of the TIP financing plus all accrued and
> unpaid interest and bank fees owed to JPMorgan Chase Bank, N.A.

ROA.1053 (¶ 20).  Bankr. 978.  Tr. Ex. CC20.

24.    Accordingly, the $6.5 million Redfish Proceeds were deposited directly into the bank account of the Trustee's counsel (Langley & Banack), then, after fees and expenses of the sale, the balance (about $5.2 million) went straight from the Langley & Banack account to pay JPMorgan in full on the balance of the

---

[68] Order (A) Authorizing and Approving the Sale of Certain of the Debtor's Assets Outside the Ordinary Course of Business and (B) Approving the Assignment and Assumption of Certain Executory Contracts and Unexpired Leases ("**Redfish Sale Order**").  ROA.1052.  Bankr. 978 and Tr. Ex. CC20.
[69] ROA.1077:14-25.  ROA.1078:1-2. ROA.1081:18-22.  Bankr. 1426 (65-66, 69 of 455).
[70] "**TIP Financing**" refers to the post-petition financing under the Financing Order and its amendments.
[71] ROA.1053 (¶ 20).  Redfish Sale Order at Bankr. 978 and Tr. Ex. CC20 (22 of 40).

TIP Financing loan.[72]   The Committee never objected to the disposition of the Redfish Proceeds pursuant to the Redfish Sale Order, and never appealed the Redfish Sale Order.

25.   On May 23, 2011, the Trustee filed notice that the Redfish Bay sale had closed on May 20, 2011 and that the JPMorgan Tranche B payment had been made to and applied by JPMorgan in accordance with the terms and conditions of the Redfish Sale Order[73] and of the Financing Order.[74]   The Committee never objected to the payment.

26.   Because of the payment of JPMorgan's secured claim out of the Redfish Proceeds pursuant to the Redfish Sale Order, Chase's second lien on the AGE Working Capital became a first lien.  ROA.1136:7-10 (" Q. Once JPMorgan Bank was paid off, what happened to your lien on the working capital assets? A. . . . It attached to the proceeds of . . . the working capital.").[75]

---

[72] ROA.1120:5-25.  ROA.1121:1-25.  ROA.1122:1-25.  ROA.1123:13-25 (Redfish Proceeds never went into the trustee's accounts).  ROA.1124:1-25.  ROA.1125:1-5 (money that was used to retire the TIP balance went straight from the Trustee's counsel's account to Chase).  ROA.1129:4-25.  ROA.1130:1-17.  ROA.1132:6-16.  Chase Settlement Hearing Bankr. 1426 (180-185, 189-190, 207 of 455) Tr. Ex. CC92 (emails concerning Redfish Proceeds); Tr. Ex. CTE19.

[73] Bankr. 978 and Tr. Ex. CC20.

[74] *See* Notice of Closing of Sale of the Redfish Bay Assets ("**Notice of Redfish Closing**") at Bankr. 981 and Tr. Ex. CC21.

[75] See District Court at ROA.2166 (when JPMorgan was paid in full, "JPMorgan's lien was extinguished.  Therefore, Chase's second lien became a first lien on these working capital assets.").  Dist. 33 (11 of 19).

27.     At the time of the Redfish Proceeds payment to JPMorgan, the Working Capital True-Up from the NuStar sale had not yet been completed. Thus, it was not known at that time whether additional payment would be made by or to NuStar, nor was the amount of any such payment known. The Working Capital True-Up would not be completed until June 10, 2011.[76]

## O.     <u>Working Capital True-Up</u>

28.     As stated earlier, the closing of the Refinery Sale was still subject to a true-up of Working Capital.[77]     The Working Capital True-Up involved an inspection of the inventory and a calculation of receivables via a complicated formula.[78]

29.     On June 10, 2011, the Trustee filed a Notice of Finalization of Working Capital Adjustment, providing notice that the Working Capital True-Up had been completed.[79]     Ultimately, the Trustee received $4.8 million from NuStar for the Working Capital.[80]

30.     Chase had held a second lien on the Working Capital behind JPMorgan.[81]     However, JPMorgan was previously paid when it received the

---

[76] Tr. Ex. CTE11.  Notice of Finalization of Working Capital at Bankr. 1019 and Tr. Ex. CC22.
[77] ROA.1078:3-25.  ROA.1079:1-25.  ROA.1080:1-11.  Bankr. 1426 (66-68 of 455).
[78] ROA.1079:1-25.  ROA.1080:1-11.  Bankr. 1426 (67-68 of 455).
[79] Bankr. 1019 and Tr. Ex. CC22.
[80] ROA.1137:19-25.  ROA.1138:1-2.  Bankr. 1426 (212-213).  CTE29.
[81] ROA.1136:1-10.  ROA.1140:4-15.  ROA.1142:11-17.  Bankr. 1426 (215, 241 of 455).

Redfish Proceeds in May 2011 pursuant to the Redfish Sale Order,[82] so Chase's second lien on the Working Capital moved to a first lien.[83]

## P.    The Payment Order

31.    On August 4, 2011, the bankruptcy court entered the **Payment Order.**[84]    The Payment Order allowed Chase to be paid the remaining $4,212,084.63 of its pre-petition secured claim, reserving the right of the Committee to seek return of that amount if Chase were found to be undersecured, and reserving Chase's rights to seek additional post-petition interest if Chase were found to be oversecured.[85]

## Q.    Chase's Motion to Compel Payment of Post-petition Interest

32.    On August 2, 2011, Chase filed its **Motion to Compel.**[86]    In the Motion to Compel, Chase contended that, based on the value of its collateral, it was oversecured as of August 1, 2011, and therefore it sought a minimum payment of $6.4 million pursuant to 11 U.S.C. § 506(b).[87]

33.    On August 1, 2011, Chase filed its **Post-petition Interest Administrative Claim**.[88]    The Post-petition Interest Administrative Claim is a

---

[82] ROA.1053 (¶ 20).  Redfish Sale Order at Bankr. 978 and Tr. Ex. CC20 (22 of 40).
[83] ROA.1136:7-10.  ROA.2166.  Dist. 33 (11 of 19).
[84] Order Granting Expedited Motion for Authority to Pay Pre-Petition Claim of Chase Capital Corporation ("**Payment Order**").  ROA.1058.  Bankr. 1109.  Tr. Ex. CC61.
[85] ROA.1059.  ROA.1060.  ROA.1061.  Bankr. 1109 and Tr. Ex. CC61 (2-4 of 5).
[86] Bankr. 1100.
[87] Bankr. 1100.
[88] Bankr. Claim Register 161-1) and Tr. Ex. CC91.

duplicate claim for post-petition interest as described in the Motion to Compel, but filed as an administrative expense.[89]

34.     On August 1, 2011, Chase filed its alternate **Diminution Claim**.[90] The Diminution Claim sought payment of $14,730,107 based on failure to adequately protect Chase's second lien on the Working Capital, in the event that Chase were found to be undersecured (as of the Petition Date, Chase had calculated that its second lien on Working Capital was for approximately $14.730 million).[91]

## R.     The Committee's Application to Value Chase's Collateral and Claim Objection

35.     The Committee contended that Chase was undersecured and therefore not entitled to post-petition interest.     Accordingly, on August 23, 2011, the Committee filed its **Application to Value**,[92] seeking to establish the value of Chase's collateral.     The Committee also filed its Claim Objection, objecting to the Post-petition Interest Administrative Claim and the Diminution Claim, in which the Trustee joined to a limited extent.[93]

---

[89] Bankr. Claim Register 161-1 and Tr. Ex. CC91.
[90] ROA.1054, Bankr. Claim Register 162-1, and Tr. Ex. CC45.
[91] ROA.1054.  Bankr. Claim Register 162-1.  Tr. Ex. CC45.
[92] Official Committee Of Unsecured Creditors' Amended Application To Value The Secured Claim Of Chase Capital Corporation Under Bankruptcy Code § 506(A) And (B) ("**Application to Value**").  Bankr. 1156.
[93] Bankr. 1148.

S.     **The Chase Settlement**

36.     Chase and the Trustee reached a settlement on the Motion to Compel, which, if approved, would also render moot[94] the duplicate Post-petition Interest Administrative Claim, the alternate Diminution Claim, the Claim Objection, and the Application to Value.  On September 13, 2011, the Trustee and Chase filed the **Settlement Motion**.[95] The **Chase Settlement** is attached as Exhibit A to the Settlement Motion.[96]

37.     Under the Chase Settlement, it was agreed that Chase have a total allowed claim of $5.0 million, split into a secured claim and an unsecured claim.[97] Of the $5.0 million, $3,615,000 would be an allowed secured claim, and $1,385,000 would be an allowed general unsecured claim.[98]   The $3,615,000 secured claim was to be paid $200,000 immediately upon approval of the Chase Settlement (which was not done until after confirmation of the Trustee's chapter 11 plan) and the remainder paid out of Chase's Specified Collateral, primarily the cash and the Insurance Claims, after payment of certain administrative expenses from such Specified Collateral.[99]   To the extent that there was not enough

---

[94]This is constitutional mootness, not equitable mootness.
[95] Settlement Motion at Bankr. 1251.
[96] Chase Settlement at Bankr. 1251 Ex. A and Tr. Ex. CC47.
[97] Bankr. 1251 Ex. A and Tr. Ex. CC47.  ROA.1106:23-25.  Bankr. 1426 (94 of 455).
[98] ROA.1107:4-15.  ROA.1108:5-17.  Bankr. 1426 (95-96 of 455).  Bankr. 1251 Ex. A and Tr. Ex. CC47.
[99] ROA.1107:13-21.  ROA.1108:5-17.  ROA.1112:4-25.  Bankr. 1426 (95-96, 100 of 455). Bankr. 1251 Ex. A and Tr. Ex. CC47.

Specified Collateral left to pay the balance of the $3,615,000, that balance would be added to the Chase Class 2 general unsecured claim of $1,385,000.[100]  Chase further agreed that it would not raise an objection to the Trustee's chapter 11 plan based on failure to provide fair and equitable treatment to Chase's secured claim under 11 U.S.C. § 1129(b)(2)(A).[101]  So, Chase compromised its claims for post-petition interest and its alternative Diminution Claim by agreeing to accept a secured claim (out of which collateral certain administrative expenses may be paid) and an unsecured claim, and that these claims would be treated as provided for under the chapter 11 plan.[102]

38.    The Committee objected to the Chase Settlement Motion.[103]

**T.    <u>Hearings Held</u>**

39.    On October 27, 2011, hearings were held on (a) the Motion to Compel, (b) the Application to Value, (c) the Post-petition Interest Administrative Claim, (d) the Diminution Claim, (e) the Claim Objection, and (f) the Settlement Motion.[104]

40.    At the October 27, 2011 hearing, the evidence showed that Chase was well oversecured after deducting the market values of the Adjacent Real Property

---

[100] Bankr. 1251 Ex. A and Tr. Ex. CC47.
[101] Bankr. 1251 Ex. A and Tr. Ex. CC47.
[102] Bankr. 1251 Ex. A and Tr. Ex. CC47.
[103] Bankr. 1292.
[104] Transcript at Bankr. 1426.  Key excerpts are at ROA.1068 through ROA.1142.

and the Tank Farm on which Chase held no lien.[105]  The evidence showed (a) that Chase had been paid its pre-petition claim of $40.2 million,[106] which was paid $36 million[107] pursuant to the Refinery Sale Order[108] and $4.212 million pursuant to the Payment Order,[109] (b) that, when JPMorgan was paid off by Redfish Proceeds, Chase's second lien became a first lien on the $4.8 million in remaining Working Capital,[110] (c) that Chase held a lien on remaining $4.2 million cash of the AGE estate,[111] (d) that Chase held a lien on remaining receivables, including the ATI Receivable of about $1.7 million[112] (e) and that Chase held a lien on Insurance Claims and tort claims of about $5.2 million,[113] all with a remaining value of about $11.3 million.[114] Chase's representative testified that the refinery sale brought $41 million for the refinery assets and $4.8 million for the Working Capital for a total of $45.8 million, and that, if one estimated that the Adjacent Real Property and the Tank Farm (on which Chase did not have a lien) were worth $3.0 million, Chase's liens would attach to $42.8 million, and if the $11.3 million on hand were added to

---

[105] ROA.1068.  Bankr. 1426.

[106] ROA.1059.  Bankr. 1109 and Tr. Ex. CC61 (2 of 5).

[107] ROA.1059.  Bankr. 1109 and Tr. Ex. CC61 (2 of 5).

[108] Bankr. 913 and at Tr. Ex. CC17.  Bankr. 1426.

[109] ROA.1058.  Bankr. 1109 and Tr. Ex. CC61.  ROA.1135:3-16.  Bankr. 1426.

[110] ROA.1136:1-10.  Bankr. 1426 (211 of 455).  ROA.2166.  Dist. 33 (11 of 19).

[111] ROA.1085:3-25.  ROA.1086:1-2.  ROA.1102:23-25.  ROA.1103:1-8.  ROA.1136:11-16.  Bankr. 1426 (73-74, 90-91, 211 of 455).

[112] ROA.1092:23-25.  ROA.1093:1-25.  ROA.1094:1-25.  ROA.1095:1-25.  ROA.1096:1-13.  ROA.1136:11-22.  Bankr. 1426 (80-84, 211 of 455).

[113] ROA.1098:10-25.  ROA.1099:1-14.  ROA.1104:21-25.  ROA.1105:1-3.  ROA.1136:11-25.  Bankr. 1426 (86-87, 92-93, 211 of 455).

[114] ROA.1137:5-15.  Bankr. 1426 (212 of 455).

that, JPMorgan would be oversecured by at least $14 million.[115]  The evidence also showed that Chase was seeking post-petition interest of about $6.4 million.[116]

41.     The Trustee also testified in support of the Chase Settlement.[117]  The Trustee testified that if Chase's $6 million in post-petition interest had to be paid, he did not have the funds to pay it, and that he would not have the funds to pay the pending $3.9 in administrative expenses.[118]  The Trustee further testified that he needed the settlement to be approved so that he could pay administrative expenses and get a plan confirmed.[119]  In support of the Chase Settlement, the Trustee testified that (a) "we've had several months to debate and defend and attack and argue those interests",[120] (b) that he tried to get all parties to agree to the settlement,[121] (c) that he wanted to "finish the job and move on,"[122] (d), that he needed to get administrative claims paid,[123] (e) that he was trying to confirm a plan,[124] and (f) that, after discussing with Chase, the Committee, and his counsel,

---

[115] ROA.1137:19-25.  ROA.1138:1-12.  Bankr. 1426 (212-13 of 455).

[116] ROA.1137:16-18.   Bankr. Claim Register 161-1 and Tr. Ex. CC91.   Bankr. 1426 (212 of 455).

[117] ROA.1074:4-25.   ROA.1075.1-9. ROA.1105 through ROA.1117.   Bankr. 1426 (62-63, 93-105   of 455).

[118] ROA.1102:18-25.  ROA.1103:1-14.  Bankr. 1426 (90-91 of 455).  As of the approximate time of the hearing, the estate had about $3.9 million in pending and unpaid administrative claims, and this did not include the $14 million for the alternate Diminution Administrative  Claim. ROA.1089:12-25.  ROA.1090.1-21.  ROA.1054.  Bankr. 1426 (77-78).

[119] ROA.1104:1-20.  Bankr. 1426 (92 of 455).

[120] ROA.1114:10-12.  Bankr. 1426 (102 of 455).

[121] ROA.1115:7-25.  Bankr. 1426 (103 of 455).

[122] ROA.1114:1.  Bankr. 1426 (103 of 455).

[123] ROA.1114:19-25.  Bankr. 1426 (102 of 455).

[124] ROA.1116:8.  Bankr. 1426 (104 of 455).

that, in his business judgment, this was the "best and most reasonable path forward."[125]

## U.   November 1, 2011 Chase Settlement Ruling

42.   On November 1, 2011, the bankruptcy court issued the **Chase Settlement Ruling**, ruling from the bench on the motions heard on October 27, 2011.[126]  The bankruptcy court stated:

> If the Court approves the compromise, the motion to compel payment of principal, interest and other charges by Chase Capital Corporation will be resolved, or, in the Clerk's jargon, will be moot.[[127]]

43.   The bankruptcy court recited the *Foster Mortgage* factors[128] and stated (a) that, although he recognized that the Committee contended that Chase was not oversecured, he did not make a decision on the matter, (b) that the Trustee made the settlement because it limits Chase's claim in this bankruptcy case, allows for the payment of administrative expenses to pursue pending claims, allows for an orderly liquidation of the estate, and provides for a potential recovery to the unsecured creditors,[129] (c) that the estate still has assets in the form of potential claims against third parties on which Chase has a lien, (d) that Chase has already

---

[125] ROA.1116:12-25.  ROA.1117:1-2.  Bankr. 1426 (104-105 of 455).

[126] The Chase Settlement Ruling is at ROA.1143 through ROA.1150 with full transcript at Bankr. 1367.

[127] ROA.1147:13-16.  ROA.1150.  Bankr. 1367 (29 of 36).

[128] *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.(In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).

[129] A global settlement that facilitated a plan of reorganization was found to be a good justification for approving a settlement in *In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (D. Del. 2006).

indicated that, if it is found to be undersecured, it will appeal, (e) that the Court feels that Chase is oversecured, so the success of the Committee's position would rest on an appeal, (f) that the compromise will speed the full and fair closing of this estate, and a distribution to creditors, (g) that, considering the costs of litigation, the unsecured creditors will probably receive more in this settlement than they would receive if the committee prevailed upon appeal, (h) that distribution to unsecured creditors will certainly be sooner than if this matter is litigated, and that (i) creditors have already waited a long time for their money, so further delay is not desirable.[130]

## V.    Chase Settlement Order Entered and Other Matters Denied

44.    Consistent with the Chase Settlement Ruling, the bankruptcy court entered the November 2, 2011 Chase Settlement Order[131] and denied (a) the Application to Value,[132] (b) the Motion to Compel[133] and (c) the Claim Objection.[134]

## W.    The Chase Settlement Appeal

45.    On November 14, 2011, the Committee appealed the orders regarding the Chase Settlement, the Application to Value, and the Committee Claim

---

[130] ROA.1143 through ROA.1150.  Bankr. 1367 (1-32 of 36).
[131] ROA.915.  Bankr. 1362.
[132] ROA.913.  Bankr. 1358.
[133] ROA.916.  Bankr. 1357.
[134] ROA.912.  Bankr. 1361.

Objection.[135]  However, the Committee neither sought nor obtained a stay pending appeal of the Chase Settlement Order.

## X.     The Chapter 11 Plan

46.     On November 15, 2011, the Trustee filed his Third Amended Plan.[136] The Third Amended Plan incorporated the Chase Settlement, which had been approved by the un-stayed Chase Settlement Order.

47.     The Committee objected to the confirmation of the Third Amended Plan.[137]

48.     On December 8, 2011, creditor ballots on the Third Amended Plan were filed.[138]  The sole creditor in plan Class 3 was Chase, who voted for the plan.[139]

49.     The Chase Settlement provided that Chase be paid $200,000 immediately upon approval of the Chase Settlement.[140]  As it turned out, that $200,000 payment had not been made, but the Third Amended Plan erroneously stated that the payment had been made.[141]

---

[135] ROA.1391.
[136] Bankr. 1395.
[137] Bankr. 1438.  Bankr. 1442.
[138] Bankr. 1448.
[139] Bankr. 1448.
[140] Chase Settlement at Bankr. 1251 Ex. A and Tr. Ex. CC47.
[141] Bankr. 1395 (22 of 48).

50.    On December 1, 2011, the Trustee filed a motion to settle the Gonzalez Litigation.[142]    The Gonzalez Settlement provided that the Third Amended Plan be amended to allow for a release of Gonzalez by Chase, a release of the ATI Receivable, and a channeling injunction for any potential claims against Gonzalez.[143]

51.    On December 9, 2011, the Trustee made redlined changes to the Third Amended Plan.[144]   Among those changes were the recognition that the $200,000 payment due to Chase under the Chase Settlement had not been made (contrary to what had previously been stated in the plan) and that such payment would not be made until after plan confirmation.[145]  The other changes were to reflect the release by Chase of any claims it might have against Gonzalez, a release of the ATI Receivable, and a channeling injunction for any claims brought against Gonzalez as required by the Gonzalez Settlement.[146]

52.    The **Plan Confirmation Hearing** and the **Gonzalez Settlement Hearing** were held on December 9, 2011.[147]  The Committee "wholeheartedly" supported the Gonzalez Settlement and the plan modifications required by the

---

[142]  Joint Motion Under Bankruptcy Rule 9019 to Approve Settlement and Release Agreement Relating to the Gonzalez Litigation ("**Gonzalez Settlement Motion**").  Bankr. 1423.
[143]  Bankr. 1423 (6 of 12).  Bankr. 1423 at Exhibit 1.
[144]  Bankr. 1450.
[145]  Bankr. 1450 (24 of 52).  *See also* Plan Confirmation Hearing transcript at Bankr. 1526 (32 of 67)(testimony that the $200,000 payment had not been made).
[146]  Bankr. 1450.  The bankruptcy court approved of the Gonzalez Settlement, which was not objected to by the Committee and has not been appealed.  Bankr. 1456.
[147]  Plan Confirmation Hearing and Gonzalez Settlement Hearing transcript at Bankr. 1526.

Gonzalez Settlement.[148]  The Committee incorporated by reference its arguments against the Chase Settlement from the Chase Settlement Hearing as its arguments against plan confirmation.[149]  The Committee also argued that Chase was not "impaired" under the plan and not entitled to vote.[150]  The Committee did not raise a "best interest of creditors" objection under 11 U.S.C. § 1129(a)(7).[151]  At the Plan Confirmation Hearing, the Trustee testified that the plan satisfied the confirmation requirements of 1129.[152]  The bankruptcy court entered a **Confirmation Order**[153] confirming the **Plan**[154] pursuant to 11 U.S.C. § 1129.  The Plan created a Liquidating Trust with Mr. Osherow as Liquidating Trustee[155] replacing the chapter 11 Trustee (Mr. Moeller) as administrator of the assets and claims.[156]  The bankruptcy court also approved the Gonzalez Settlement,[157] which was supported by the Committee and not appealed.  The Committee appealed the Confirmation Order.

---

[148] Bankr. 1526 (12, 42 of 67).

[149] Bankr. 1526 (42-45 of 67).

[150] Bankr. 1526 (45 of 67).

[151] Bankr. 1526.

[152] Bankr. 1526 (18-29 and Exhibit 6).

[153] Bankr. 1460.  ROA.806 through ROA.838.

[154] The plan that was confirmed was the Fourth Amended Plan, which was the Third Amended plan with the redlined changes.  ROA.806.  Bankr. 1460.  Bankr. 1459.  ROA.326 through ROA.376.  This was discussed at Bankr. 1526 (41-42).

[155] Plan at ROA.326 through ROA.376 and Bankr. 1459.  See ROA.1662.  Bankr. 1513.

[156] Bankr. 1651.

[157] Order Granting Joint Motion Under Bankruptcy Rule 9019 to Approve Settlement and Release Agreement Relating to the Gonzalez Litigation ("**Gonzalez Settlement Order**") at Bankr. 1456.

**Y.**   **District Court Appeal on the Merits**

53.   The District Court consolidated the settlement and plan appeals.[158] On January 3, 2014, the District Court issued its Memorandum Opinion[159] and Judgment[160] denying the Committee's appeals.

## III.
## SUMMARY OF THE ARGUMENT

This is an appeal of (1) the bankruptcy court's approval of a settlement and (2) the bankruptcy court's confirmation of a plan. Chase contended that it was oversecured and therefore entitled to post-petition interest of $6.4 million under 11 U.S.C. § 506(b). Alternatively, Chase contended that if it was undersecured, it was entitled to an administrative expense claim for failure to provide adequate protection of its lien on working capital under 11 U.S.C. sections 361 and 363. The Committee contended that Chase was undersecured and filed an application to value Chase's collateral. Chase and the Trustee reached a settlement of Chase's claims that provided for an agreed claim for Chase to be treated in a chapter 11 plan to be filed. The bankruptcy court held a hearing on the settlement and on the application to value, hearing evidence on the value of Chase's collateral. The bankruptcy court approved the settlement, and declined to rule on the valuation issue in light of the approval of the settlement.

---

[158] ROA.2154. Dist. 23.
[159] ROA.2156 through ROA.2174. Dist. 33.
[160] ROA.2175. Dist. 34.

The Committee's appeal is an attack on the evidence considered by the bankruptcy court. In simplest terms, the collateral was as follows. The refinery sale brought $41 million. The working capital adjustment brought $4.8 million. There was $4.2 million cash in the AGE estate at the time of the settlement hearing. Chase held a lien on insurance claims estimated at $5.2 million. Chase held a lien on the ATI Receivable estimated at $1.7 million. The foregoing adds up to $56.9 million. Chase did not hold a lien on the Adjacent Real Property, which was sold along with the refinery. The Adjacent Real Property has a stipulated value of $1.9 million. So, subtract 1.9 from 56.9, which leaves 55. Chase also did not hold lien on the Tank Farm, which was also sold with the refinery. The Committee's expert gave the Tank Farm a fair market value of $1.3 million. Subtracting the value of the Adjacent Real Property and the Tank Farm from the total value of AGE's assets leaves $53.7 million (56.9 – 1.9 – 1.3 = 53.7) in collateral that Chase had a lien on , making Chase still oversecured well beyond $6.4 million, because Chase's prepetition claim was $40.2 million. Given this evidence, it was proper for the bankruptcy court to approve the settlement, especially considering other facts, such as the pendency of Chase's alternate $14 million administrative claim and the inability of the Trustee to confirm a plan without the settlement.

The Committee says that Chase's second lien on the $4.8 million in working capital was worthless because JPMorgan held a first lien on that working capital. However, weeks prior to the generation of the working capital proceeds, JPMorgan's first lien was paid off by the Redfish Proceeds pursuant to an un-objected to court order, leaving the working capital only encumbered by Chase's lien at the time of the settlement hearing.

The Committee claims that its expert alternatively opined that the Tank Farm had a "contributory" or "allocated" value of $4.0 million. However, this value was not a fair market value, and was the product of an out-of-court conversation between the expert and the purchaser. The Committee can show no clear error with respect to the bankruptcy court not adopting this valuation.

The Committee points out that, weeks after the entry of the order approving the settlement, the insurance claims settled for only $2.35 Million, and, in connection with the Gonzalez settlement, the ATI Receivable was released. This information was obviously not available to the bankruptcy court at the time of the settlement hearing, so the bankruptcy court could not have possibly erred in not considering it.

The Committee complains that, despite the bankruptcy court's approval of the settlement, the bankruptcy court had a duty to make factual findings in connection with the application to value the collateral. With the approval of the

settlement, there was no longer a case or controversy with respect to the application to value, so the matter was constitutionally moot.

The chapter 11 plan incorporated the Chase Settlement.  In objecting to confirmation of the plan, the Committee incorporated its objections to the Chase Settlement, which was approved weeks prior to the plan confirmation hearing.  The Committee's objections to the plan based on the settlement have no merit because the Committee's objections to the settlement have no merit.

The Committee complains that Chase should not have been allowed to vote on the plan, because the plan incorporated the settlement, so Chase was not impaired.  Chase was impaired because: (1) the plan delayed payment of $200,000 of the settlement payments, (2) Chase was not receiving post-confirmation interest, and (3) the plan required Chase to release Gonzalez and issued a channeling injunction against Chase and others.

## IV.
## ARGUMENT

### V.
### ISSUE 1: WHETHER THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN APPROVING THE CHASE SETTLEMENT

**A.**    **Chase Claimed it Was Oversecured and Entitled to Post-petition Interest**

The Chase Settlement involved a settlement of whether Chase was oversecured, and by how much.  Chase claimed recovery of post-petition interest pursuant to 11 U.S.C. § 506(b).  When a creditor is oversecured and its agreement

provides for interest,[161] the creditor may recover post-petition interest charges. *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059 (5th Cir. 1998). 11 U.S.C. § 506(b).

Chase was owed $40,212,084.63 as of the Petition Date[162] and calculated post-petition interest at $6,379,000.[163] Therefore, if the value of Chase's collateral exceeded $46,591,084, Chase would be entitled to recover all of its principal and post-petition interest. Chase and the Trustee agreed to a settlement of that issue.

## B.  Approval Of A Settlement Is Based On The Trustee's Business Judgment And The Court's Discretion

Bankruptcy Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a); *see also Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). A bankruptcy court's approval of a settlement is reviewed "extremely deferentially," and should not be overturned unless its decision was manifestly erroneous and a clear abuse of discretion. *In re Global Vision Prods., Inc.*, 2009 U.S. Dist. LEXIS 64213 *6 (S.D.N.Y. 2009). Approval of a settlement in bankruptcy lies within the sound discretion of the bankruptcy judge. *In re Capmark Fin. Group Inc.*, 438

---

[161] There has been no issue raised as to whether the agreement provides for interest or the calculation of that interest; the only issue was the value of the collateral.
[162] ROA.1059. Bankr. 1109 and Tr. Ex. CC61 (2 of 5). Chase Proof of Claim at Tr. Ex. CC1.
[163] ROA.1133:10-19. Bankr. 1426 (208 of 455). Bankr. Claims Register 161-1 and Tr. Ex. CC91.

B.R. 471, 475-76 (Bankr. D. Del. 2010); *CFB-5, Inc. v. Cunningham*, 371 B.R. 175, 181 (N.D. Tex. 2007). In determining whether to approve a trustee's application to settle a controversy, a bankruptcy court should not substitute its judgment for that of the trustee, but rather the bankruptcy court may "give weight to the opinions of the trustee, the parties, and their attorneys." *Guippone,* 2011 U.S. Dist. LEXIS at 126026 *14-15; *E. 44th Realty, LLC v. Kittay*, 2008 U.S. Dist. LEXIS 7337 *23 (S.D.N.Y. Jan. 23, 2008). The bankruptcy court must be hesitant to substitute its own judgment for that of counsel. *In re Lee Way Holding Co.*, 120 B.R. 881, 909 (Bankr. S.D. Ohio 1990). The Trustee's business judgment is accorded appropriate deference. *E. 44th Realty,* 2008 U.S. Dist. LEXIS at 7337 *29. The Trustee may rely on his counsel and his counsel's judgment in reaching a determination whether or not to proceed with a settlement agreement. *Lee Way*, 120 B.R. at 891. Similarly, the bankruptcy court itself may rely upon the opinions of counsel. *Id.*

C.    **No Evidentiary Or Mini Trial Required; Canvass The Issues To See If The Settlement Falls Below The Lowest Point Of Reasonableness**

Approval of a settlement does not require a mini-trial on the merits. *Cajun Elec.,* 119 F.3d at 356; *Capmark*, 438 B.R. at 475-76; *Lee Way*, 120 B.R. at 890. In fact, there is no evidentiary hearing even required for approval of a settlement. *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. Ill. 1994); *Capmark*, 438 B.R. at 475-76. The bankruptcy judge is not required to rule on the

merits of the underlying claim. *CFB-5*, 371 B.R. at 182 ("the Bankruptcy Court was not required to rule on the merits of Surf City's claim"). A bankruptcy court is not required to know all the relevant facts in deciding whether to approve a settlement. *E. 44th Realty*, 2008 U.S. Dist. LEXIS at 7337 *23. The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision. *Cajun Elec.*, 119 F.3d at 356. In evaluating a settlement, a bankruptcy judge need not decide the numerous questions of law and fact raised by the settlement, but rather, should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness. *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *E. 44th Realty*, 2008 U.S. Dist. LEXIS at 7337 *23; *Capmark*, 438 B.R. at 475-76. Here, the bankruptcy judge did more than canvass the issues; he conducted a full evidentiary trial, reviewing numerous exhibits and hearing testimony from witnesses.[164]

## D.   **Best Interest Of the Estate Standards**

The bankruptcy court should determine if the settlement is fair and equitable and in the best interest of the estate. *Cajun Elec.*, 119 F.3d at 355. The factors for approval of settlements in bankruptcy are:

> (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

---

[164] ROA.1068 through ROA.1142.  Bankr. 1426.

(2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(3) All other factors bearing on the wisdom of the compromise.

*Cajun Elec.*, 119 F.3d at 356; *Foster Mortgage*, 68 F.3d at 917.

Under the "all other factors" rubric, there are two additional factors bearing on the decision to approve a proposed settlement. *Cajun Elec.*, 119 F.3d at 356; *Foster Mortgage*, 68 F.3d at 917. First, the bankruptcy court should consider the best interests of the creditors, with proper deference to their reasonable views. *Cajun Elec.*, 119 F.3d at 356; *Foster Mortgage*, 68 F.3d at 918. Second, the bankruptcy court should consider the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. *Cajun Elec.*, 119 F.3d at 356; *Foster Mortgage*, 68 F.3d at 918. There is a presumption of regularity; collusion is not presumed. *Lee Way*, 120 B.R. at 909.

As stated above, approval of settlement agreements are reviewed for a clear abuse of discretion, and the bankruptcy court defers to the business judgment of the trustee. The evidence showed that Chase was oversecured by an estimated $11.3 million, which, but for the Chase Settlement, would have allowed it to recover the entire $6.4 million it had claimed pursuant to 11 U.S.C. § 506(b).[165]

---

[165] ROA.1137:5-15. Bankr. 1426 (212 of 455).

The refinery sale brought $41 million for the refinery assets[166] and $4.8 million for the Working Capital[167] for a total of $45.8 million. Part of the $45.8 million included the proceeds from the Adjacent Real Property (stipulated market value of $1,949,250)[168] and the Tank Farm (market value $1,331,000 per Committee's expert;[169] market value $950,000 per Chase expert).[170] So, if one subtracts $3,280,250[171] from $45.8 million, one gets $42,519,750. However, Chase also held a lien on Insurance Claims and tort claims estimated at about $5.2 million,[172] a lien on the ATI Receivable of $1.7 million,[173] and a lien on remaining $4.2 million cash in the estate,[174] making the total value of its collateral more than $46,591,084 such that it was entitled to the entire $6,379,000 in post-petition interest.[175]

---

[166] Moeller Affidavit at Bankr. 909 and Tr. Ex. CC15.

[167] ROA.1137:23-25. ROA.1138:1-2. Bankr. 1426 (212-213 of 455). Tr. Ex. CTE29. While JPMorgan held a first lien on the Working Capital Asset, that first lien was virtually eliminated when JPMorgan received $5.2 million from the Redfish Proceeds pursuant to the June 10, 2011 Redfish Bay Order. ROA.1120:5-25. ROA.1121:1-25. ROA.1122:1-25. ROA.1123:13-25. ROA.1124:1-25. ROA.1125:1-5. ROA.1136:7-10. Bankr. 1426 (180-85, 190, 207 of 455). Tr. Ex. CC92 (emails regarding Redfish Proceeds); CTE19.

[168] Stipulation at Bankr. 1426 (11-12 of 455).

[169] Tr. Ex. CTE 43 (M. Glen appraisal of Tank Farm). Bankr. 1426 (275-76 of 455).

[170] Tr. Ex. CC94 (Stancil appraisal of Tank Farm). Bankr. 1426 (18-19 of 455).

[171] This figure uses the Committee's fair market value of $1,331,000 for the Adjacent Real Property.

[172] ROA.1098:10-25. ROA.1099:1-11. Bankr. 1426 (86-87).

[173] ROA.1093 through ROA.1096. ROA.1136:11-21. Bankr. 1426 (81-84, 211 of 455).

[174] ROA.1085:3-25. ROA.1086:1-2. ROA.1102:23-25. ROA.1103:1-8. ROA.1136:11-16. Bankr. 1426 (73-74, 90-91, 211 of 455).

[175] ROA.1098:12-25. ROA.1099:1-6. ROA.1104:21-25. ROA.1105:1-3. ROA.1136:11-25. Bankr. 1426 (86-87, 92-93, and 211 of 455).

The settlement provided for a secured claim of $3.615 million secured by certain collateral, but allowed that collateral to be used for certain expenses of administration such that Chase would not recover all of its collateral.[176] Chase was also given under the settlement a general unsecured claim of $1.385 million, plus any deficiency from the $3.615 million.[177] In terms of benefit to the estate, it is much more beneficial that Chase have a general unsecured claim than a fully secured claim. If Chase's full $6.4 million in post-petition interest had been allowed, the Trustee would not have been able to pay it and administrative expenses, too.[178] In the event that Chase was found to be undersecured, it claimed a $14 million administrative expense claim for failure of adequate protection of its lien on Working Capital,[179] which the Trustee did not have funds to pay.[180] The settlement not only resolved hotly contested issues that would have necessitated lengthy and expensive litigation, it resolved them in such a way that allowed the Trustee to propose a feasible plan of reorganization. Thus, it did not fall below the lowest point of reasonableness.

---

[176] Chase Settlement at Bankr. 1251 Ex. A and Tr. Ex. CC47. Settlement Motion at Bankr. 1251.

[177] Bankr. 1251 Ex. A and Tr. Ex. CC47. Bankr. 1251.

[178] ROA.1102:18-25. ROA.1103:1-14. Bankr. 1426 (90-91 of 455).

[179] *See* Diminution Claim at ROA.1054, Bankr. Claim Register 162-1 and Tr. Ex. CC45. *See also Kaiser*, 339 B.R. at 96 (in approving a settlement, the bankruptcy noted that the settling creditor would likely amend its administrative claim from $13 million to $63 million, creating a risk to the solvency of the estate).

[180] ROA.1102:18-25. ROA.1103:1-14. Bankr. 1426 (90-91 of 455).

**VI.**

<u>**ISSUE 2: WHETHER THE BANKRUPTCY COURT ERRED IN DENYING THE APPLICATION TO VALUE AND THE CLAIM OBJECTION AFTER CONSIDERING THE SAME ISSUES IN APPROVING THE CHASE SETTLEMENT**</u>

The bankruptcy court denied the Motion to Compel, the Application to Value, and the Claim Objection without opining on the merits of those matters because the bankruptcy court approved the Chase Settlement, which settled those matters. The claim objection and valuation issues were constitutionally moot when the bankruptcy court approved the Chase Settlement.[181] The exercise of judicial power under Article III of the United States Constitution depends upon the existence of a case or controversy; without it, a federal court has no jurisdiction. *Doe v. Veneman*, 380 F.3d 807, 814 (5th Cir. 2004). An actual controversy must exist at all stages of litigation. *Id.* Where a controversy no longer exists, a claim based on that controversy is moot. *Id.* Generally, settlement of a dispute between two parties renders moot any case between them growing out of that dispute. *Doe*, 380 F.3d at 814; *Yunker v. Allianceone Receivables Mgmt.*, 701 F.3d 369, 372 (11th Cir. 2012); s*ee also In re Heritage Organization, L.L.C.,* 375 B.R. 230, 285 (Bankr. N.D. Tex. 2007)(court not required to rule on the merits of a claim objection when court approved settlement of claim objection; "the . . . argument that § 502 confers not only a right to object to a claim but also a right to a ruling

---

[181] ROA.1147:13-16. <u>Bankr. 1367</u> (29, 32 of 36). ROA.1150:11-15.

would mean that the Court could never permit a settlement of a claim objection"); *Kaiser*, 339 B.R. at 95 (concluding that the Bankruptcy Court did not err in staying claim objection and subsequently mooting the objection after evaluating the settlement, which was meant, at least in part, to resolve that objection). The bankruptcy court specifically made no finding on Chase's administrative claim or the valuation of Chase's collateral, only stating that the court "feels" that Chase is oversecured.[182] It would have been error for the bankruptcy court to issue an advisory opinion on the claim objection and valuation issues after the bankruptcy court had approved the settlement of these issues, as there was no longer a case or controversy as a result of the settlement ruling. A federal court does not have the power to render advisory or hypothetical opinions. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Because the Chase Settlement rendered moot the Application to Value, the Bankruptcy Court correctly denied the Application to Value without ruling on the merits thereof.

## VII.
## ISSUE 3: WHETHER THE BANKRUPTCY COURT ERRED IN CONFIRMING THE PLAN

The Committee raises two primary complaints about the Plan confirmation. First, the Committee contends that the Plan should not have been confirmed because it incorporated the Chase Settlement, and the Chase Settlement is not fair

---

[182] ROA.1149:11-13. Bankr. 1367 (31 of 36).

and equitable.   As set forth above, and incorporated by reference herein, the Bankruptcy Court did not err in approving the Chase Settlement.   Therefore, it could not have been error to approve the Plan based on its adoption of the Chase Settlement.

Second, the Committee contends that Chase's vote accepting the Plan should not have counted.  One requirement for plan confirmation is that:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10).

Class 3 under the Plan was the Chase claim, which voted in favor of the Plan.[183]   Therefore, Chase's Class 3 claim satisfies 1129(a)(10) if (1) Chase was entitled to vote its claim, and (2) Chase was "impaired."[184]

The Chase claim was based on the Chase Settlement.  The Chase Settlement was a settlement of Chase's claim for post-petition interest under 11 U.S.C. § 506(b) and its alternate administrative expense claim.  The total amount of accrued 506(b) interest is deemed an additional part of the secured creditor's allowed claim.  *Airadigm Communs., Inc. v. FCC (In re Airadigm Communs., Inc.)*, 547 F.3d 763, 771 (7th Cir. 2008); *Key Bank N.A. v. Milham (In re Milham)*, 141 F.3d

---

[183] [Bankr. 1459](). [Bankr. 1448]().
[184] No issue was raised as to whether Chase was an insider.

420, 423 (2d Cir. 1998) ("On the date of confirmation, the allowed claim of an oversecured creditor is augmented by the inclusion of section 506(b) pendency interest.").  Accordingly, a 506(b) claim, being one added to and part of a claim under 11 U.S.C. section 502, can vote.  11 U.S.C. § 1126(a)(holder of a claim or interest under Section 502 may accept or reject a plan).

Moreover, the Chase Settlement and the Plan replaced the 506(b) claim with a $5.0 million claim, $3,615,000 of which would be an allowed secured claim, and $1,385,000 of which would be an allowed general unsecured claim.[185]  No one argues that an allowed secured claim or a general unsecured claim cannot vote.  11 U.S.C. § 1126(a).

The next issue is whether Chase's Class 3 claim is impaired under the Plan.  A class of claims is impaired under a plan unless, with respect to each claim of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.  11 U.S.C. § 1124(1).  Any impairment, even "artificial impairment" devised specifically to create an impaired class, is sufficient.  *In re Vill. at Camp Bowie I, L.P.*, 454 B.R. 702, 708 (Bankr. N.D. Tex. 2011); *see also In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985)(plan that changed the status of the unsecured creditors

---

[185] ROA.1107:13-21.  ROA.1108:5-17.  ROA.1112:4-25.  Bankr. 1426 (95-96, 100 of 455).  ROA.1065.  Bankr. 1251 Ex. A and Tr. Ex. CC47.  ROA.348.  ROA.349.  Bankr. 1459 (23-24 of 51).

from unimpaired to impaired so that they could approve the plan and effectuate the cram down was proper; "Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith.").[186]

The Committee argues that Chase's claim is not impaired because the Plan incorporates the Chase Settlement, so if Chase gets under the Plan what it is entitled to under the Chase Settlement, there is no impairment. However, Chase did not get under the Plan precisely what it was entitled to under the Chase Settlement. The Chase Settlement provided that Chase be paid $200,000 immediately upon approval of the Chase Settlement, as part of the payment of the secured portion of the claim.[187]   The Chase Settlement was approved on November 2, 2011.[188]   The $200,000 payment was not made.   On December 9, 2011, the Trustee amended the plan to reflect the fact that the $200,000 payment had not been made.[189]   As of the Plan Confirmation Hearing, the $200,000 had not been made.[190]   The delay in payment of the $200,000 was an alteration of Chase's rights under Bankruptcy Code section 1124(1).

---

[186] The District Court correctly pointed out that the Committee never alleged any bad faith. ROA.2172.  Dist. 33 (17 of 19).  *See also* Fed. R. Bankr. P. 3020(b)(2)(bankruptcy court may find good faith without evidence if a good faith objection is not raised).
[187] ROA.1065.  Bankr. 1251 Ex. A and Tr. Ex. CC47.
[188] ROA.915.  Bankr. 1362.
[189] Bankr. 1450.
[190] Bankr. 1526 (32 of 67)(testimony that the $200,000 payment had not been made).  ROA.348. Bankr. 1459 (23 of 51).

The Plan also did not provide for post-confirmation interest on the Chase Class 3 claim, which is impairment. *In re Introgen Therapeutics*, 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010) ("it appears clear from the legislative intent and case law" that modifying claimant's contract rights and "not allowing for post-petition interest" is impairment).

Finally, the Plan further altered Chase's rights in connection with the Gonzalez Settlement. The Gonzalez Settlement required that the Plan provide for a release by Chase of its claims against Gonzalez, that the Trustee release the estate's claims to the ATI Receivable (on which Chase held a lien), and that the Plan provide a channeling injunction against all parties of any future claims against Gonzalez.[191] The Plan was amended accordingly.[192] As noted above, the Committee fully supported the Gonzalez Settlement, even the Plan provisions concerning the Gonzalez Settlement, and did not appeal the Gonzalez Settlement Order. The Plan amendments as required by the Gonzalez Settlement further altered Chase's rights and impaired Chase.

---

[191] Gonzalez Settlement at Bankr. 1423 Exhibit 1.
[192] Bankr. 1450. ROA.372 (Plan at 14.6). ROA.373 (Plan at 14.7).

# VIII.
## ISSUE 4: WHETHER THE COMMITTEE'S NINE ARGUMENTS HAVE ANY MERIT

### A.     Waiver Issues

As shown below, the Committee has waived numerous arguments by either failure to raise them in the lower courts or failure to adequately brief them to either the District Court or this Court.  Failure to raise an issue at the trial court level results in waiver of that issue on appeal.  *Kohler v. Englade*, 470 F.3d 1104, 1114 (5th Cir. 2006).  Failure to adequately brief an issue also waives the issue.  *United States v. Thames*, 214 F.3d 608, 612 n.3 (5th Cir. 2000) (where a party fails to adequately brief an issue, the issue is waived); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 260 n.9 (5th Cir. 1995) (noting that "the failure to provide any legal or factual analysis of an issue results in waiver of that issue").  An appellant abandons all issues not raised and argued in its initial brief on appeal. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).  A party cannot raise issues for the first time in a reply brief.  *Stern v. Halligan*, 158 F.3d 729, 731 n.3 (3d Cir. 1998).  Appellate briefs may not "incorporate by reference."[193]  *Albrechtsen v. Board of Regents*, 309 F.3d 433, 436 (7th Cir. 2002); *R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 37 n.6 (1st Cir. 2002).

---

[193] The Committee District Brief attempted to incorporate several documents by reference.  Dist. 28 (7 of 24).

**B.**    <u>**This Appeal is Primarily a Clear Error Challenge**</u>

Chase claimed post-petition interest, based on a factual issue of the value of its collateral.  That issue was settled by the Chase Settlement.  The Committee challenges the approval of the Chase Settlement primarily based on the Committee's view of the value of the Chase collateral.  This Court reviews the factual components of the lower court's determination -- the underlying factual findings and the inferences drawn therefrom -- for clear error.  *Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995).  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.  *Id*.  A mistake has been committed if the factual finding seems "so improbable" as to belie belief, or is "incredible as to the admitted facts," or is "inconceivable," or is "internally inconsistent."  Moore's Federal Practice - Civil, § 206.03[2] (3d ed. 2013).  This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.  *Reich*, 55 F.3d at 1045.  "If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing] court . . . may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *Id*.

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id*.

The Committee also complains that the Plan incorporated the Chase Settlement, which is simply another method of attacking the factual issue of whether the facts supported approval of the Chase Settlement. The Committee's second complaint about the Plan, and sole legal issue, is whether Chase was "impaired" within the meaning of 11 U.S.C. § 1124 such that Chase may vote on the Plan.

## C.    Committee Argument No. 1:

Argument No. 1 contends that "The District Court erred by failing to consider the Claim Objection Order or Valuation Order or, mooting of the Valuation Order/Claim Objection Order – using improper standards applicable to consideration of settlement issues under R. 9019 FED. R. BANKR. P."[194]    The Committee further states, without citation to authority: "The Bankruptcy Court's obligation to undertake a value analyses and the District Court's obligation on appeal to review the finding of the Bankruptcy Court on value and diminution objection issues may not be substituted by a canvasing [sic] approach and analysis of settlement factors."[195]

---

[194] Committee 5th Brief (24).
[195] Committee 5th Brief (27).

First, the issue of the bankruptcy court "failing to consider" the claim objection and valuation issues was not adequately raised by the Committee in its appeal before the District Court.[196]   Accordingly, the issue was waived at the District Court level by failure to adequately brief the issue before the District Court.  *Thames*, 214 F.3d at 612 n.3.

Second, the claim objection and valuation issues were constitutionally moot once the bankruptcy court approved the Chase Settlement.  *See Doe,* 380 F.3d at 814; *Yunker*, 701 F.3d at 372; *Kaiser*, 339 B.R. at 95, and discussion at Issue No. 2 above.  The District Court stated: "The committee appears to argue that the Bankruptcy Court was required to make a detailed factual finding that Chase was oversecured.  The Court does not agree that such a requirement exists."[197]   The Committee cites no authority otherwise.  Furthermore, the Committee cites no authority in Argument No. 1 other than the undisputed proposition that the creditor bears the burden to show it is oversecured in a 506(b) proceeding, so the issue is waived.  *Thames*, 214 F.3d at 612 n.3.  Neither the bankruptcy court nor the District Court were required to make factual findings on the Motion to Compel and the Application to Value, and to do so would have been an improper advisory opinion in light of the approval of the Chase Settlement.

---

[196] Committee's Statement of Issues at Bankr. 1479 (2-3 of 28) and Committee District Brief at Dist. 28.
[197] Dist. 33 (9 of 19 n.5).

## D.  **Committee Argument No. 2**

Argument No. 2 contends that District Court erred by limiting consideration of Plan issues to those related to Chase's impaired status.[198]  The Committee complains that the District Court did not address 11 U.S.C. § 1129(a)(1).  Neither did the Committee.  The Committee District Brief contained little discussion or analysis of section 1129(a)(1).[199]  The issue was waived at the District Court level.  *Thames*, 214 F.3d at 612 n.3.  In its Fifth Circuit Brief, the Committee also fails to provide any analysis of section 1129(a)(1), so the issue is waived at this level.  *Thames*, 214 F.3d at 612 n.3.

The Committee complains that the District Court did not address 11 U.S.C. § 1129(a)(7).[200]  At the Plan Confirmation Hearing, the Trustee provided unimpeached and unrebutted testimony that the Plan satisfied section 1129(a)(7).[201]  The Committee did not object to the Plan confirmation based on section 1129(a)(7)[202] or even mention it at the Plan Confirmation Hearing.[203]  So this issue was waived at the bankruptcy court level.  *Kohler*, 470 F.3d at 1104.  The Committee District Brief contains little discussion or analysis of section

---

[198] Committee 5th Brief (27).
[199] Dist. 28.
[200] Committee 5th Brief (27).
[201] Bankr. 1526 (22-32 of 67).
[202] Bankr. 1438 and Bankr. 1442.
[203] Bankr. 1526 (21-22 of 67)(testimony by proffer).

1129(a)(7).[204]  The issue was also waived at the District Court level.  *Thames*, 214 F.3d at 612 n.3.  In its Fifth Circuit Brief, the Committee also fails to provide any analysis of section 1129(a)(7), other than complaining that the courts below should have done an analysis.[205]  The Committee provides no discussion of how the Plan failed to meet the requirements of section 1129(a)(7).  So the issue is waived at this level.  *Thames*, 214 F.3d at 612 n.3.

In any event, the Committee's section 1129(a)(1) and 1129(a)(7) arguments are complaints about whether the Chase Settlement, as incorporated into the Plan, is fair and equitable.  As shown elsewhere in this Appellees' Brief, the bankruptcy court did not abuse its discretion in approving the Chase Settlement, thus its incorporation into the plan could not be unfair or inequitable.

## E.     Committee Argument No. 3

Argument No. 3 contends that the District Court erred when confirming the Bankruptcy Court's findings that the Chase Settlement was a fair and reasonable compromise of Chase post-petitions claims, that Chase would likely succeed on the merits, and that expenses and duration of litigation outweighed potential benefits to the unsecured creditors.[206]

---

[204] Dist. 28.
[205] Committee 5th Brief (28).
[206] Committee 5th Brief (28).

The Committee argues that the Chase Settlement should not have been approved because Chase's lien on the $4.8 million in Working Capital was worthless. Here, the Committee seeks to take $4.8 million in Working Capital from the Chase collateral value by mixing up the chronology of events to create a fiction that JPMorgan was paid out of the Working Capital rather than the Redfish Proceeds. The Refinery Sale Order was entered on April 14, 2011[207] and the Notice of Closing of the refinery sale was filed on April 19, 2011.[208] As part of the refinery sale, the Working Capital was sold. However, as of April 19, 2011, the Working Capital True-Up had not been done,[209] so there were no proceeds from the Working Capital to be distributed. In the meantime, the Redfish Proceeds were generated on May 20, 2011.[210] Pursuant to the May 20, 2011 Redfish Sale Order (which was not objected to by the Committee or appealed), JPMorgan was paid out of the Redfish Proceeds.[211] Thus, when JPMorgan was paid from the Redfish Proceeds pursuant to an un-objected to court order, Chase's second lien on the

---

[207] Bankr. 913 and at Tr. Ex. CC17.

[208] Bankr. 921 and Tr. Ex. CC18.

[209] Bankr. 1019 and Tr. Ex. CC22.

[210] ROA.1053 (¶ 20). Redfish Sale Order at Bankr. 978 and Tr. Ex. CC20 (22 of 40).

[211] ROA.1053 (¶ 20). Bankr. 978 and Tr. Ex. CC20 (22 of 40). ROA.1120:5-25. ROA.1121:1-25. ROA.1122:1-25. ROA.1123:13-25 (Redfish Proceeds never went into the trustee's accounts). ROA.1124:1-25. ROA.1125:1-5 (money that was used to retire the TIP balance went straight from the Trustee's counsel's account to Chase). ROA.1129:4-25. ROA.1130:1-17. ROA.1132:6-16. ROA.1136:7-10. Chase Settlement Hearing Bankr. 1426 (180-185, 189-190, 207 of 455) Tr. Ex. CC92 (emails concerning Redfish Proceeds); Tr. Ex. CTE19.

Working Capital moved up in priority.[212]   Weeks later, on June 10, 2011, the Working Capital True-up was completed and the $4.8 million in proceeds from the Working Capital became available.[213]   The Committee's statement that: "The working capital sale proceeds contributed no value to Chase inferior liens, those $4.8 Million in sales proceeds having been attached to the J.P. Morgan DIP loan of $11.8 Million, leaving no excess proceeds available to credit Chase collateral value or inferior lien"[214] is false, since, due to the prior payment of the Redfish Proceeds, JPMorgan was no longer owed $11.8 million when the Working Capital proceeds became available.

The Committee complains that "The District Court clearly erred with [sic] applying unencumbered sales proceeds from the Redfish Bay Sale to pay DIP loan obligations – after DIP liens had previously attached to funds resulting from working capital sales proceeds."[215]   First, this issue was waived long ago.   The application of the Redfish Proceeds to pay the DIP obligations to JPMorgan was done, not by the District Court, but by the bankruptcy court, pursuant to the Redfish Sale Order.[216]   The Committee never objected to the Redfish Sale Order and never appealed the Redfish Sale Order.   Second, there was no error in any

---

[212] ROA.1130:12-17.  ROA.1136:7-10.  ROA.2166.  Dist. 33 (11 of 19).
[213] Bankr. 1019 and Tr. Ex. CC22.
[214] Committee 5th Brief (17).
[215] Committee 5th Brief (23).
[216] Redfish Sale Order at Bankr. 978 and Tr. Ex. CC20 (22 of 40).

event.  JPMorgan had a lien on both the Working Capital and the Redfish Proceeds.[217]  JPMorgan could have been paid from either source.  JPMorgan was in fact paid from the Redfish Proceeds pursuant to the Redfish Sale Order weeks prior to the Working Capital becoming available.[218]  If the Committee wanted to force JPMorgan to take its payment out of the Working Capital rather than the Redfish Proceeds, the Committee might have objected to the Redfish Sale Order and filed an action seeking to marshal the JPMorgan collateral.[219]  However, no objection to the Redfish Sale Order was made, no marshaling action was filed, and under the Financing Order (which was also not appealed) no marshaling is allowed.[220]

The Committee also seeks to relitigate the facts with respect to the value of the unencumbered Tank Farm.  The Committee states that the Tank Farm was

---

[217] Financing Order at Bankr. 113 and Tr. Ex. CC4 (13 of 45 ¶33).  ROA.1131:17-21.

[218] ROA.1120:5-25.  ROA.1121:1-25.  ROA.1122:1-25.  ROA.1123:13-25 (Redfish Proceeds never went into the trustee's accounts).  ROA.1124:1-25.  ROA.1125:1-5 (money that was used to retire the TIP balance went straight from the Trustee's counsel's account to Chase).  ROA.1129:4-25.  ROA.1130:1-17.  ROA.1132:6-16.  Bankr. 1426 (180-185, 189-190, 207 of 455).  Tr. Ex. CC92.

[219]  The typical marshaling scenario is where a senior creditor has security interests in two properties that belong to the same debtor and there is a junior creditor who has a security interest in only one of those properties; the equitable doctrine of marshaling would allow a court to force the senior creditor to satisfy its claim from the property to which the junior creditor has no access.  Jacquelyn Michael Davis, *Marshaling of Assets in Bankruptcy*, 5 BANK. DEV. J. 309, 309 (1987).  However, by bankruptcy trustees have also attempted to initiate marshaling for the benefit of unsecured creditors, such as to force the secured creditor to use the assets of a non-debtor guarantor to satisfy its liens.  *Id.* at 313-14.  In any event, the "no marshaling" feature of the Financing Order would prohibit forcing senior creditor JPMorgan from satisfying its claims out of the Working Capital when JPMorgan sought to be paid out of the Redfish Proceeds.

[220] ROA.1051(¶71).  Bankr. 113 and Tr. Ex. CC4 (28 of 45, ¶ 71).

worth "a fair market value of $1.331 Million, or a NuStar allocated value of $4 Million."[221]  The bankruptcy court made no factual findings as to the value of the Tank Farm, because, as stated above, the approval of the Chase Settlement mooted the Motion to Compel and the Application to Value.  In approving the Chase Settlement, the bankruptcy court stated that "the Court feels that Chase is oversecured."[222]  The Chase expert opined that fair market value of the Tank Farm was $950,000 as of April 1, 2011.[223]  The Committee expert, Mr. Glen, submitted a report that the fair market value of the Tank Farm was $1,331,000 as of as of September 14, 2011.[224]    Mr. Glen then submitted an October 19, 2011 supplemental appraisal report with a "contributory" value of $4,000,000 as of September 14, 2011 for the Tank Farm.[225]  Mr. Glen testified that the contributory value was not a fair market value and that he obtained the value simply by talking to a NuStar employee, who was not identified or qualified as an expert, for about 20 minutes.[226]  Thus, the Committee cannot identify any clear error concerning the Tank Farm value with respect to factual findings supporting the Chase Settlement.

The Committee uses events that occurred after the Chase Settlement was approved to argue that the Chase Settlement should not have been approved.  The

---

[221] Committee 5th Brief (18-19).
[222] ROA.1149:11-13.  Bankr. 1367 (31 of 36).
[223] Tr. Ex. CC94 (appraisal of Tank Farm).  Bankr. 1426 (18-19 of 455).
[224] CTE43.
[225] CTE44.
[226] Bankr. 1426 (276-278 of 455).

Committee states: "[t]he liquidation of the remaining assets within a month following the settlement – [netted] only $2.35 Million from the insurance settlement."[227]    The Committee also states: "Chase released the ATI claim and settled the insurance claim for $2.35 Million"[228] and "[t]he business interruption/insurance claim of AGE was resolved in November, resulting in payment of $2.35 Million (the "Insurance Settlement")."[229]    These events happened after the Chase Settlement was approved, so it could not have been error for the bankruptcy court to not consider them in approving the Chase Settlement.

For the sake of argument, using the Committee's hindsight approach to settlement approval with post-settlement recoveries on the collateral, the numbers still support approval of the Chase Settlement.

| Action | Figure | Comment |
|--------|--------|---------|
| Add | $41,000,000 | Sales price for refinery on which Chase held a lien |
| Add | $4,800,000 | Working capital on which Chase held a lien |
| Add | $2,350,000 | Ultimate recovery from insurance proceeds (on which Chase held a lien) after approval of the Chase Settlement |
| Add | $0 | Ultimate recovery from ATI Receivable (on which Chase held a lien), which was released after approval of the Chase Settlement as part of the Gonzalez Settlement |

---

[227] Committee 5th Brief (39).
[228] Committee 5th Brief (43).
[229] Committee Brief (44).

| Subtotal | $48,150,000 | |
|---|---|---|
| Subtract | $1,949,250 | Stipulated value of Adjacent Real Property, on which Chase held no lien |
| Subtract | $1,331,000 | Committee expert's fair market value of Tank Farm, on which Chase held no lien (Chase's expert valued it at $950,000) |
| Subtotal | $44,869,750 | Value of Chase's collateral in hindsight after considering post-settlement approval events |
| Subtract | $40,212,084 | Principal amount of Chase's pre-petition claim |
| Total | $4,657,666 | Amount by which Chase was oversecured in hindsight after considering post-settlement approval events |

Based on the above figures (which do not even consider Chase's lien on existing cash), had the Chase Settlement not been approved, Chase would have been entitled to payment of $4,657,666 as a secured 506(b) claim. Compare this result to the Chase Settlement, which provided (1) a secured claim of only $3,615,000; however that secured claim was subject to reduction for the payment of administrative expenses, and (2) a general unsecured claim of $1,385,000, augmented by the deficiency from the $3,615,000, and paid cents on the dollar with the rest of the general unsecured creditors. In hindsight, Chase might have been better off without the Chase Settlement, but no plan confirmation would have been likely.

F.    **Committee Argument No. 4**

Argument No. 4 contends that District Court clearly erred when determining that Chase was oversecured and the value of Chase collateral in excess $40.2 Million reflects "the most conservative valuation offered by the Committee."[230]

In the Chase Settlement Ruling, the bankruptcy court stated "Based on the evidence presented, the Court feels that Chase is oversecured."[231]   However, the bankruptcy court made no specific findings of valuation, instead holding the matter to be moot in light of the approval of the Chase Settlement.[232]

The Committee complains about the following statement by the District Court:

> Even considering the eventual liquidated amount of these claims, not the speculative values that existed at the time of the settlement hearing, Chase's collateral was more valuable than its secured claim. Including the $2.35 million insurance settlement in the final tally, even the most conservative valuation offered by the committee gave Chase's collateral a value of $42.2 million, well over its $40.2 million pre-petition claim.

ROA.2168 and Dist. 33 (13 of 19).

The statement by the District Court was made in the context of discussing the approval of the Chase Settlement, not in making a determination of value pursuant to the Motion to Compel or the Application to Value (those matters were rendered moot by the Chase Settlement Order).   Neither the bankruptcy court nor

---

[230] Committee 5th Brief (40).
[231] ROA.1149:11-13.  Bankr. 1367 (31 of 36).
[232] ROA.1147:13-16.  Bankr. 1367 (29 of 36).

the District Court made any detailed findings of value, only that the values were uncertain enough to support approval of the settlement.  The District Court stated: "The committee appears to argue that the Bankruptcy Court was required to make a detailed factual finding that Chase was oversecured.  The Court does not agree that such a requirement exists."[233]  The District Court also stated: "Therefore, in light of (a) the uncertain value of the insurance and pipeline litigation, and (b) the contested value of the unencumbered assets in the NuStar sale, it was reasonable for the Bankruptcy Court to expect that Chase could prove that it was oversecured."[234]

There was no finding as to valuation, because the approval of the Chase Settlement made the valuation issues moot.  In any event, as discussed above, there was considerable evidence supporting the valuation observations made by the District Court, and no clear error as to these facts.

## G.     Committee Argument No. 5

Argument No. 5 contends that the "District Court's findings supporting Chase's oversecured status are clearly erroneous."[235]  First, the District Court was serving as an appellate court pursuant to 28 U.S.C. § 158(a).  Appellate courts do not find facts.  *In re Placid Oil Co.*, 158 Bankr. 404, 412 (N.D. Tex. 1993)("This

---

[233] ROA.2164.  Dist. 33 (9 of 19).
[234] ROA.2168.  Dist. 33 (13 of 19).
[235] Committee 5th Brief (44-45).

court does not find facts.  Neither is it free to view the evidence differently as a matter of choice.").  Second, this is an attack on the factual findings by the bankruptcy court below.  The bankruptcy court made no findings with respect to Chase's entitlement to interest (the subject of the Motion to Compel and the Application to Value, which were rendered moot by the Chase Settlement Order).  The bankruptcy court did make findings with respect to approval of the Chase Settlement, which were supported by the evidence, and for which no clear error has been identified as stated above.

## H.    Committee Argument No. 6

Argument No. 6 contends that the District Court erred in its determination that Chase would assert a $14 Million administrative/diminution claim if found to be unsecured, and that the Bankruptcy Court weighed this factor in favor of settlement approval.[236]  The Committee's statement of issues filed with the bankruptcy court contains no mention of this issue, only a general issue about the approval of the settlement.[237]  The Committee District Brief contains no discussion of this issue.[238]  The issue was waived at the District Court level.  *Thames*, 214 F.3d at 612 n.3.  Furthermore, the Diminution Claim was in evidence and was properly considered by the bankruptcy court.  *Kaiser*, 339 B.R. at 96 (in approving

---

[236] Committee 5th Brief (48).
[237] Committee's Statement of Issues at Bankr. 1479 (2-3 of 28).
[238] Dist. 28.

a settlement, the bankruptcy noted that the settling creditor would likely amend its administrative claim from $13 million to $63 million, creating a risk to the solvency of the estate).

## I.    Committee Argument No. 7

Argument No. 7 contends that the "District Court erred by finding Chase to be oversecured and in its allocation of sales proceeds resulting from working capital sales with NuStar and Redfish Bay Sale, attributing $4.8 Million in working capital proceeds from the Redfish Bay Sale to Chase collateral value."[239]   This argument is addressed in response to Committee Argument No. 3 above.

## J.    Committee Argument No. 8

Argument No. 8 contends that the "District Court erred when considering Plan issues focusing solely on Chase's impaired status ignoring other plan objections."[240]   This is the same argument as Argument No. 2.   The section 1129(a)(7) arguments were waived as stated above in response to Argument No. 2. Furthermore, Argument No. 8 contains no citation to authority for the Committee's position that the District Court was required to rule on issues that were not even briefed before it.  *Thames*, 214 F.3d at 612 n.3.

---

[239] Committee 5th Brief (50).
[240] Committee 5th Brief (51).

**K.**     **Committee Argument No. 9**

Argument No. 9 contends that the "Court's determination that Chase was an impaired creditor is a clearly erroneous."[241]   This argument is addressed at Issue No. 3 above.

## IX.
## CONCLUSION

The bankruptcy court carefully considered extensive evidence bearing on the Chase Settlement and did not abuse its discretion in approving it.   The bankruptcy court did not err in holding that Chase was impaired and eligible to vote on the Plan and in confirming the Plan.   The District Court did not err in affirming the bankruptcy court.

---

[241] Committee 5th Brief (52).

Dated:    May 30, 2014

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.

By */s/Steve A. Peirce*
    Steve A. Peirce
    State Bar No. 15731200
300 Convent Street, Suite 2100
San Antonio, Texas  78205-3792
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205
Email:
steve.peirce@nortonrosefulbright.com

Toby L. Gerber
State Bar No. 07813700
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200
Email:
toby.gerber@nortonrosefulbright.com

**COUNSEL FOR APPELLEE**
**CHASE CAPITAL CORPORATION**
By */s/ Natalie F. Wilson*
David S. Gragg
Texas Bar No. 08253300
Natalie F. Wilson
Texas Bar No. 24076779
**LANGLEY & BANACK, INC.**
745 East Mulberry, Suite 900
San Antonio, Texas  78212
Telephone:  210-736-6600
Telecopier:  210-735-6889

**COUNSEL FOR APPELLEE**
**RANDOLPH N. OSHEROW IN HIS**
**CAPACITY AS SUCCESSOR-IN-**
**INTEREST TO ERIC J. MOELLER,**
**CHAPTER 11 TRUSTEE OF THE**
**ESTATE OF AGE REFINING, INC.**

# CERTIFICATE OF SERVICE

In compliance with FED. R. APP. P. 31, 5TH CIR. R. 31, and ECF Filing Standards, I certify that, on May 30, 2014  a copy of the brief was sent to the counsel listed below via mail, and a PDF copy was served when this brief was filed through the ECF system.

> Michael G. Colvard
> Martin & Drought, P.C.
> Bank of America Plaza, 25th Floor
> 300 Convent Street
> San Antonio, TX   78205
> Counsel for Appellant, The Official Committee of Unsecured Creditors
> Via mcolvard @mdtlaw.com
>
> Steve A. Peirce
> 300 Convent Street, Suite 2100
> San Antonio, Texas  78205-3792
> Via steve.peirce@nortonrosefulbright.com
> Counsel for Appellee Chase Capital Corporation
>
> Toby L. Gerber
> FULBRIGHT & JAWORSKI L.L.P.
> 2200 Ross Avenue, Suite 2800
> Dallas, Texas  75201-2784
> Via toby.gerber@nortonrosefulbright.com
> Counsel for Appellee Chase Capital Corporation

In accordance with 5TH CIR. R. 25.2.13, I further certify that all privacy redactions have been made.

Finally, I certify that the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ <em>Natalie F. Wilson</em>
Attorney Name

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of FED. R. APP.

P. 32(a)(7)(B) because:

    x    this brief contains 13,851 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), or

    ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FED. R. APP. P.

32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

    x    this brief has been prepared in a proportionally spaced typeface using Microsoft© Word 2007 in 14-point TrueType© Times New Roman typeface, or

    ☐    this brief has been prepared in a monospaced typeface using Microsoft© Word 2007 with _____ characters per inch and [type style].

Dated:  May 30, 2014.


_____/s/ *Natalie F. Wilson*_____
Attorney for Appellee Randolph N.
Osherow, successor-in-interest to Eric J.
Moeller, Chapter 11 Trustee